Smita CHAKRAVARTHY, Appellant,

v.

**The STATE of Texas, Appellee.**

**NUMBER 13–14–00086–CR**

Court of Appeals of Texas,
Corpus Christi-Edinburg.

Delivered and filed February 9, 2017

Rehearing Overruled April 12, 2017

---

Victoria Guerra, Law Office of Victoria Guerra, McAllen, TX, for Appellant.

Ricardo P. Rodriguez, Hidalgo County District Attorney, Glenn W. Devino, Assistant District Attorney, Edinburg, TX, for Appellee.

Before Justices Rodriguez, Benavides, and Hinojosa

## MEMORANDUM OPINION

Memorandum Opinion by Justice Benavides

By nine issues, appellant Smita Chakravarthy ("Smita") appeals her conviction for injury to a child causing bodily injury, a third-degree felony. *See* TEX. PENAL CODE ANN. 22.04(f) (West, Westlaw through 2015 R.S.). Smita alleges that: (1) the trial court committed reversible error and abused its discretion regarding voir dire time limits; (2) the trial court abused its discretion by prohibiting counsel from asking questions to the voir dire panel that hindered the ability to use proper challenges; (3) the evidence was legally insufficient to support the conviction with the introduction of extraneous offenses; (4) the trial court erred by admitting the medical examiner's testimony because the evidence the medical examiner relied on was unreliable; (5) the trial court abused its discretion by denying Smita's directed verdict based on venue; (6) the trial court committed error by not allowing certain jury instructions; (7) defense counsel was ineffective during the guilt-innocence

phase by not providing timely notice of an expert witness to the State and trial court; (8) the State committed misconduct by not stating they received fax notice of defense's expert witness; and (9) the trial court committed error by refusing to let Smita's expert witness testify based on the State's objections. We affirm.

## I. BACKGROUND

A Hidalgo County grand jury indicted Smita in 2007 with three felony offenses related to the death of her infant son, Baby R:[1] (1) murder, a first-degree felony; (2) capital murder, a capital felony; and (3) injury to a child causing serious bodily injury, a first-degree felony. *See* TEX. PENAL CODE ANN. §§ 19.03, 19.02, 22.04 (West, Westlaw through 2015 R.S.). Baby R was injured and died as a result of the injuries he sustained in February 2006. A trial on the merits commenced in 2013.

In 2006, Smita, her husband, EVR Chakravarthy, and their infant son, Baby R, were visiting the United States for work training and a vacation. Multiple witnesses testified that Smita and EVR first went to California and then came to Mission to visit family residing there. While visiting the Mission area, Baby R was injured. During the State's case in chief, witnesses testified that Baby R arrived at the Mission Hospital emergency room on February 17, 2006. After Baby R's father told doctors that Baby R had fallen off a bed and was wheezing while breathing, Dr. Carlos Ramirez suspected a brain injury and requested an MRI that later confirmed that Baby R had a skull fracture. Baby R was transferred to Valley Baptist Medical Center ("Valley Baptist") in Harlingen because of its pediatric infant trauma unit. There, Baby R's initial injuries were confirmed, and treatment proceeded.

During Baby R's hospitalization, Mission Police Department officers conducted an investigation related to Baby R's injuries. Following tips from hospital staff, Investigator Joe Aguilar of Mission Police Department was assigned to the case and interviewed Smita. Investigator Aguilar also visited Smita's home to observe the scene where Baby R allegedly fell. Investigator Aguilar testified that Smita had given a statement in which Smita stated she had put Baby R on the bed, fallen asleep, and later awoke to find that Baby R had fallen off the bed.

Hospital staff observed that Baby R suffered from additional injuries to his body. Both doctors at Mission Hospital and Valley Baptist noted that Baby R had what appeared to be bite marks all over his body and injuries to his fingernails. Doctors noted that these injuries are not consistent with a ten-month-old baby without teeth. Doctors also observed that Baby R had hemorrhaging in his eyes and sought further consultation from an ophthalmologist to examine Baby R. Additionally, doctors at Valley Baptist consulted with forensic dentist, Dr. Tara Rios, to examine the bite marks on Baby R's body, as well as forensic pathologist, Dr. Norma Jean Farley, to document the injuries throughout the body. Lastly, dermatologist Dr. James Campbell, examined the bite marks on Baby R's body to rule out skin infections.

As the police investigation continued into what happened to Baby R, Baby R suffered injury to his brain stem and stopped breathing on his own. Neurological tests revealed that Baby R was brain dead. Baby R subsequently died on February 24, 2006. As required by state law in Texas, in the death of a child under the age of six where abuse is suspected, an autopsy was performed on Baby R. *See*

---

1. We will refer to the child in this case as Baby R, as to protect his identity.

TEX. CODE CRIM. PROC. ANN. § 49.10(e)(2) (West, Westlaw through 2015 R.S.).

Dr. Farley conducted the autopsy on Baby R. Due to the injuries, Dr. Farley witnessed on Baby R's body, she asked Dr. Rios to examine his body again. Mission police observed the autopsy and asked Dr. Rios to take dental molds of Smita and EVR Chakravarthy for forensic dentistry analysis.[2] Additionally, Dr. Farley sent Baby R's eyes to Dr. Frank Scribbick, an ocular pathologist, for further evaluation. Dr. Scribbick found hemorrhages in all layers of the retina, as well as the ocular nerve on both eyes. Dr. Scribbick testified he believed there was no other reason for the hemorrhaging other than a traumatic event.

Dr. Farley testified that other than the already documented fracture on Baby R's skull, she also observed two additional fractures–two fractures on the left side of his skull and one large fracture on the right side. Two of the fractures Dr. Farley observed had not been evident on Baby R's previous x-rays and MRIs. Dr. Farley opined at trial that Baby R died of homicide and the cause of his death was blunt force trauma.

Dr. Rios also testified that after taking dental molds of the parents, she noticed Smita had unique characteristics to her teeth. She believed the bite marks matched Smita, but sent them to a colleague for a second opinion. Dr. Peter Marsh, also a forensic odonatologist, evaluated the dental molds made by Dr. Rios and compared them to the bite mark photographs sent to him. After evaluating both, Dr. Marsh determined Smita probably bit Baby R and caused his injuries.

Smita presented her version of the events before the jury. Smita claimed that Baby R had fallen off the bed while she was sleeping and hit his head, thereby causing the fractures to his skull. Smita also presented multiple experts to contradict the State's experts and support her theory of Baby R's injuries.[3]

Following the presentation of the evidence, a Hidalgo County jury convicted Smita of a lesser-included offense of Count One, which was injury to a child causing bodily injury. *See id.* § 22.04(f). The trial court assessed punishment at two years' incarceration in the Texas Department of Criminal Justice–Institutional Division, probated for two years and a fine of $5000.00. Smita's motion for new trial was denied, and this appeal followed.

## II. SUFFICIENCY OF THE EVIDENCE [4]

By her fourth and sixth issues, Smita asserts the evidence is insufficient to support her conviction.

### A. Standard of Review and Applicable Law

When evaluating a sufficiency challenge, the reviewing court views the evidence in the light most favorable to the verdict to determine whether a rational jury could find the defendant guilty beyond a reasonable doubt. *Brooks v. State*, 323 S.W.3d 893, 899 (Tex. Crim. App. 2010) (plurality opinion); *see Jackson v. Virgi-*

---

**2.** A search warrant was obtained and properly executed for the collection of the dental molds.

**3.** The experts who testified for Smita were: Chris Van Ee, an engineer; John Lenox, an engineer; Krishna Turlapati, a pediatric intensive care unit doctor; Thomas Young, a forensic pathologist; and Venaatarmn Reddy,

a general pediatrics doctor. Dr. Carlos Mattoli, a pathologist, was later allowed to testify during the punishment phase.

**4.** Smita filed multiple briefs in this case. We will consider for this appeal the issues presented in her final amended brief filed on February 18, 2015.

*nia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). In order to have reversal of a conviction on a claim of insufficiency of the evidence, Smita must show that no rational jury could have found all the elements of the offense beyond a reasonable doubt. *Brooks*, 323 S.W.3d at 902. The jury is the sole judge of the credibility of the witnesses and the weight to be given to their testimony, and a reviewing court is not to substitute its judgment as to facts for that of the jury as shown through its verdict. *Montgomery v. State*, 369 S.W.3d 188, 192 (Tex. Crim. App. 2012). When the reviewing court is faced with a record supporting contradicting inferences, the court must presume that the jury resolved any such conflict in favor of the verdict, even if it is not explicitly stated in the record. *Id.*

 A reviewing court must measure the sufficiency of the evidence by the elements of the offense as defined by a hypothetically correct jury charge. *Villarreal v. State*, 286 S.W.3d 321, 327 (Tex. Crim. App. 2009) (citing *Malik v. State*, 953 S.W.2d 234, 240 (Tex. Crim. App. 1997)). Such a charge is one that accurately sets out the law, is authorized by the indictment, does not unnecessarily increase the State's burden of proof or unnecessarily restrict the State's theories of liability, and adequately describes the particular offense for which the defendant was tried. *Id.*

A person commits an offense of bodily injury to a child if she: (a) intentionally or knowingly, (b) causes, (c) bodily injury to a child. *See* TEX. PENAL CODE ANN. § 22.04.

### B. Discussion

#### 1. Rule 404(b) Evidence

 By her fourth issue, Smita claims the evidence is legally insufficient to uphold her conviction because all of the evidence the State presented was included in its notice of extraneous offenses filed prior to trial. *See* TEX. R. EVID. 404(b). Smita

claims the State must show substantive evidence to support the conviction and it must be evidence not covered by their extraneous offense notice. *See id*. However, Smita's assumptions are mistaken.

 "An extraneous offense is any act of misconduct, whether resulting in prosecution or not, that is not shown in the charging papers." *Manning v. State*, 114 S.W.3d 922, 926 (Tex. Crim. App. 2003). The State charged Smita with capital murder, felony murder, and injury to a child alleging that Smita struck Baby R with an unknown object or by an unknown manner and means. *See* TEX. PENAL CODE ANN. §§ 19.03, 19.02, 22.04. The State's Notice of Extraneous Offenses included the following: "(1) repeatedly biting victim Baby R; (2) striking victim's head against object causing skull fractures, cerebral edema, and hemorrhaging; (3) repeatedly digging nails into victim's skin; and (4) striking victim's head causing eye hemorrhaging." Items two and four both were charged offenses in the indictment and therefore, do not constitute extraneous offenses. *See Manning*, 114 S.W.3d at 926. Even though those offenses were contained in the notice of extraneous offenses, since they were charged in the indictment, evidence presented that substantiated the charge is not extraneous offense evidence. The jury could have rationally held that the State proved their cause with more than just extraneous evidence. *See Brooks*, 323 S.W.3d at 902. Smita's fourth issue is overruled.

#### 2. Forensic Expert Testimony

 By her sixth issue, Smita argues the trial court erred in allowing the testimony of Dr. Farley into evidence, and without it, the evidence presented by the State was all circumstantial and cannot support the verdict. However, "juries are permitted to make reasonable inferences

from the evidence presented at trial, and circumstantial evidence is as probative as direct evidence in establishing the guilt of an actor. Circumstantial evidence alone can be sufficient to establish guilt." *Hooper v. State*, 214 S.W.3d 9, 14–15 (Tex. Crim. App. 2007). As reflected in the testimony set out in the background section of this opinion, the State presented evidence that Smita was the person with Baby R when his injuries occurred and that no one else was present during the event. Testimony showed that Baby R not only had fractures to his skull, but multiple other injuries that could lead a reasonable person to believe that Smita had deliberately injured Baby R.

■■■ Smita's version of events that Baby R had fallen off the bed and hit his head, causing the fractures to his skull was also brought before the jury. Although Smita presented her version of alternate theories of causation for Baby R's injuries, "it is a jury, not a reviewing court that accepts or rejects reasonably equal competing theories of causation." *Goodman v. State*, 66 S.W.3d 283, 287 (Tex. Crim. App. 2001) (en banc). The jury did find Smita guilty of a lesser-included offense, leading this Court to believe it took into account part of her explanation of the events that occurred. Smita's sixth issue relating to the forensic expert's testimony is overruled.

### 3. Venue

■■■ Smita also argues that the evidence is insufficient to establish that proper venue for this case was Hidalgo County. Her allegation is based on testimony provided by defense expert witness, Dr. Krishna Turlapati, a pediatric intensive care unit doctor. Dr. Turlapati stated that Baby R's injuries were older injuries and in different states of healing, so the injuries could not have occurred in Hidalgo County. However, the State presented multiple witnesses who testified that the injuries had recently occurred, establishing that the injuries happened in Hidalgo County. Smita herself testified that Baby R was not taken to the hospital for a previous injury to his head. The determination that the State proved all the elements of the offense is within the province of the jury, and it was entitled to believe the circumstantial evidence presented by the State. *See Hooper*, 214 S.W.3d at 14–15. We overrule the remainder of Smita's sixth issue.

### III. Voir Dire

By her first three issues, Smita contends that the trial court: (1) committed reversible error by imposing improper time restrictions on her voir dire and abused its discretion by denying Smita's request to extend the period of questioning during voir dire; (2) abused its discretion by prohibiting defense counsel from questioning the venire members about proper areas of inquiry; and (3) abused its discretion by not allowing the intelligent use of challenges for cause and peremptory challenges due to the denial of proper questioning.

### A. Standard of Review and Applicable Law

■■■ The purpose of voir dire is to:

(1) elicit information that would establish a basis for a challenge for cause because the venireman is legally disqualified from serving or is biased or prejudiced for or against one of the parties or some aspect of relevant law; (2) facilitate the intelligent use of peremptory challenges that may be "exercised without a reason stated, without inquiry and without being subject to the court's control"; and (3) indoctrinate the juror on the party's theory of the case and to

establish rapport with the prospective jury members.

*Wappler v. State*, 183 S.W.3d 765, 772 (Tex. App.–Houston [1st Dist.] 2005, pet. ref'd) (citing *Sanchez v. State*, 165 S.W.3d 707, 710–11 (Tex. Crim. App. 2005)).

A "trial court has broad discretion over the process of selecting a jury." *Barajas v. State*, 93 S.W.3d 36, 38 (Tex. Crim. App. 2002) (en banc); *see Boyd v. State*, 811 S.W.2d 105, 115 (Tex. Crim. App. 1991). "While the right of the accused to question a veniremember freely and broadly is a right that should never be unnecessarily limited or restricted, trial courts may impose reasonable restrictions on the exercise of voir dire examination." *Boyd*, 811 S.W.2d at 115. "The main reason for this is that voir dire could go on forever without reasonable limits." *Barajas*, 93 S.W.3d at 38.

Such "time limitations are reviewed under an abuse of discretion standard." *Cantu v. State*, 842 S.W.2d 667, 687 (Tex. Crim. App. 1992) (en banc). No bright-line rule identifies what amount of time allowed for voir dire is too short. The amount of time allotted is not, alone, conclusive. *Wappler*, 183 S.W.3d at 773. "A reasonable time limitation for one case may not be reasonable for another case; thus, each case must be examined on its own facts." *Id.* Absent an abuse of discretion, "we will not reverse the trial court's refusal to allow defense counsel additional voir-dire time." *Id.*

Additionally, "we leave to the trial court's discretion the propriety of a particular question and the trial court's discretion will not be disturbed absent an abuse of discretion." *Barajas*, 93 S.W.3d at 38. "A trial court's discretion is abused

only when a proper question about a proper area of inquiry is prohibited." *Id.* "A question is proper if it seeks to discover a juror's view on an issue applicable to the case." *Id.* However, "a voir-dire question that is so vague or broad in nature as to constitute a global fishing expedition is not proper and may be prohibited by the trial court." *Wappler*, 183 S.W.3d at 774.

When a party complains of an inability to question the venire collectively, the following two-part test applies: (1) whether the complaining party attempted to prolong the voir dire by asking questions that were irrelevant, immaterial, or unnecessarily repetitious; and (2) whether the questions the party was not permitted to ask were proper voir-dire questions. *Id.* at 773; *see McCarter v. State*, 837 S.W.2d 117, 119 (Tex. Crim. App. 1992). "When a party's voir dire is terminated as he attempts to question venire members individually, we must also consider a third factor—(3) whether the party was prevented from examining a prospective juror who actually served on the jury." *Wappler*, 183 S.W.3d at 773; *see McCarter*, 837 S.W.2d at 119.

## B. Discussion

### 1. Time Limitations

Prior to the beginning of voir dire, the trial court notified both the State and Smita that it would allocate ninety minutes of voir dire to each side. Despite this admonishment, Smita's counsel was given an extra ten minutes to conduct voir dire, totaling one hundred minutes. Following the conclusion of voir dire by both sides, Smita asked the trial court for additional time in order to be able to intelligently exercise the defense's peremptory strikes.[5] The trial court allowed Smita to question

---

5. Prior to trial, Smita had filed a motion requesting two hundred and forty minutes or four hours in which to conduct her voir dire presentation. The trial court limited that to ninety minutes, with leeway given to Smita.

the panel following the conclusion of time regarding relatives in law enforcement. Additionally, the trial court asked questions prior to voir dire to help fill in missing information on the juror cards and did allow both sides to individually question certain jurors, without holding that time accountable to either side.

Smita's counsel requested additional time by stating the defense was not able to get into issues regarding punishment because Smita had elected that the jury decide punishment. Smita also requested to ask certain questions if an extension of time was granted. The State objected to any extension of time, stating that defense counsel mismanaged the time given.

### 2. Requested Questions

 Smita made a bill of exception following the expiration of her initial time for voir dire relating to the questions defense counsel wanted to ask the voir dire panel. Included on the bill of exception were the following questions:

(1) are jurors preconditioned to accept scientific evidence as conclusive proof of guilt based on television shows and forensic science experts?

(2) what factors would be important to you in making your sentencing decision?

(3) do you have any bias against any of the law upon which the defendant is entitled to rely?

(4) does anyone fit under any of the reasons to challenge for cause under article 35.16 of the code of criminal procedure?

(5) is anyone related by the third degree of consanguinity to the victim or prosecutors in the case?

(6) does anyone if they have a bias or prejudice against any of the law applicable to this case upon which the defendant is entitled to rely on as a defense? As to mitigation at the punishment phase?

(7) is anyone influenced in any way by the fact Smita is from India?

(8) does anyone have a bias or prejudice in favor of the State because a child was injured and died?

(9) has anyone formed an opinion as to guilt or innocence based on what they have heard? Give Smita the benefit of the doubt during deliberations based on defense counsel asking that question?

(10) why would an innocent person not testify on their own behalf?

(11) has anyone previously worked in the district attorney's office or a police department?

(12) has anyone been the victim of a crime and would the way you were treated by the district attorney's office or police affect your decision?

(13) counsel wanted to individually ask what each juror's personal belief of what is a reasonable, what does it mean to be beyond a reasonable doubt?

(14) how many of the jurors would need to hear from the defendant to decide the case?

(15) would they vote for conviction merely because the defendant did not testify?

(16) would you expect the defendant to testify in order for you to give her a fair trial in this case?

(17) counsel wanted to ask jurors about the use of any type of medicine that would cause them to mentally unable to stay with the trial for three weeks and/or keep their mind attentive for approximately eight to twelve hours a day in the courtroom.

Here, the questions posed by defense counsel were mainly irrelevant, immaterial, or unnecessarily repetitious. *See Wappler*, 183 S.W.3d at 773. Questions one, three, five, six, eight, nine, ten, fourteen, fifteen, and sixteen were denied by the trial court as previously asked. Question two was denied as being overbroad. Question four sought to cover all the reasons listed in article 35.16(a) of the code of criminal procedure. *See* TEX. CODE CRIM. PROC. ANN. art. 35.16(a) (West, Westlaw through 2015 R.S.).[6] Question seven was previously covered by Smita's co-counsel. Questions nine, eleven, twelve, thirteen, and seventeen were denied by the trial court. None of the questions propounded by Smita were deemed to be proper questions. Most of the questions had been asked previously by the trial court or the State, and the trial court determined them to be unnecessarily repetitious. *See Wappler*, 183 S.W.3d at 773.

Smita makes general accusations that without all the information these questions could have provided, her rights were violated and because the questions were not asked, the jury was certainly composed of unqualified jurors. She, does not, however, provide specific instances of how this occurred. Defense counsel was given a total of one hour and forty minutes in which to conduct voir dire and had been advised of the time limitation before voir dire commenced. In addition, the trial court questioned jurors who had provided limited information on their juror cards and conducted individual voir dire following each side's questioning. That time was not deducted from either side and was not limited by the court. Smita has not shown how

the trial court abused its discretion by restricting time and denying questions. The trial court has the liberty to control the voir dire examination. *See Boyd*, 811 S.W.2d at 115. The trial court was more than generous with the time given to both sides here. We hold there was no reversible error when the trial court set time restrictions for both sides, no abuse of discretion by the trial court when it denied Smita's request to extend time or to ask certain questions, and no abuse of discretion by the trial court regarding Smita's ability to use her peremptory challenges and challenges for cause. We overrule Smita's first, second, and third issues.

## IV. ADMISSIBILITY OF EXPERT WITNESS TESTIMONY

By her fifth issue, Smita argues the trial court reversibly erred by admitting Dr. Farley's testimony as an expert witness.

### A. Standard of Review and Applicable Law

Before admitting expert testimony under Rule 702, the trial court must be satisfied that three conditions are met:

(1) the witness qualifies as an expert by reason of his knowledge, skill, experience, training, or education;

(2) the subject matter of the testimony is an appropriate one for expert testimony; and

(3) admitting the expert testimony will actually assist the fact-finder in deciding the case.

*Rodgers v. State*, 205 S.W.3d 525, 527 (Tex. Crim. App. 2006); *see* TEX. R. EVID. 702. "A trial court need not exclude expert testi-

---

**6.** While Smita is entitled to challenging for cause any juror that does not properly qualify under article 35.16(a), jurors in Hidalgo County are preliminarily questioned regarding these qualifications. *See* TEX. CODE CRIM. PROC. ANN. art. 35.16(a) (West, Westlaw through 2015 R.S.). The trial court was given no evidence that this procedure had not been used with this panel, and the trial court denied Smita's attempt to question the entire panel regarding theses qualifications again.

mony simply because the subject matter is within the comprehension of an average jury." *Rodgers*, 205 S.W.3d at 527. "If the witness has some special knowledge or additional insight into the field that would be helpful, then the expert can assist the trier of fact to understand the evidence or to determine a fact in issue." *Id.* "Because the possible spectrum of education, skill, and training is so wide, a trial court has great discretion in determining whether a witness possesses sufficient qualifications to assist the jury as an expert on a specific topic on a particular case." *Id.* at 527–28.

Appellate courts can consider several criteria in determining if the trial court abused its discretion in allowing the testimony of an expert witness. *See id.* at 528. "First, is the field of expertise complex? The degree of education, training, or experience that a witness should have before he can qualify as an expert is directly related to the complexity of the field about which he proposes to testify." *Id.* "Second, how conclusive is the expert's testimony? The more conclusive the expert's testimony, the more important is his degree of expertise." *Id.* "And third, how central is the area of expertise to the resolution of the lawsuit? The more dispositive it is of the disputed issues, the more important the expert's qualifications are." *Id.* "In any event, the appellate court must review the trial court's ruling in light of what was before that court at the time the ruling was made." *Id.* at 528–29.

### B. Discussion

Smita argues that Dr. Farley's opinion testimony regarding Baby R's cause of death was unreliable, speculative, or conclusory. To evaluate scientific evidence's reliability, we look to the criteria established in *Kelly v. State*, which are: "(1) the underlying scientific theory must be valid; (2) the technique applying the theory must be valid; and (3) the tech-

nique must have been properly applied on the occasion in question." *Vela v. State*, 209 S.W.3d 128, 133 (Tex. Crim. App. 2006) (quoting *Kelly*, 824 S.W.2d 568, 573 (Tex. Crim. App. 1992)). Additionally, there are non-exclusive factors the trial court can consider when determining reliability. *See id.* Although a foundation must be established for the reliability of an expert's opinion, " 'experience alone may provide a sufficient basis for an expert's testimony in some cases.' " *Id.* (quoting *Gammill v. Jack Williams Chevrolet, Inc.*, 972 S.W.2d 713, 726 (Tex. 1998)).

Smita alleges that Dr. Farley's opinion was devoid of scientific theory and contains invalid techniques. Smita also claims that the trial court disregarded Dr. Farley's rate of "no error" in her opinion and techniques and lack of other experts to test and evaluate Farley's techniques.

Yet, Dr. Farley testified during a *Daubert* hearing outside the presence of the jury. *See Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). At the hearing, both sides questioned Dr. Farley's qualifications, theories, evidence examined, and how she came to her conclusions. The trial court also asked questions of Dr. Farley as well. Smita's expert, Dr. Thomas Young, also testified during the *Daubert* hearing, challenging Dr. Farley's methods and research. *See id.* The trial court ultimately allowed Dr. Farley to testify for the State and qualified her as an expert in pathology and child abuse.

Smita also argues that Dr. Farley did not evaluate Baby R's medical history and conduct her own additional investigation. However, Dr. Farley testified that she reviewed the police investigation reports, as well as the medical records as part of her analysis when she conducting the autopsy. Dr. Farley also testified about the infor-

mation upon which she relied, information from her investigation and from the reports from the other experts who evaluated Baby R to form her conclusions. Dr. Farley also testified that she relied on scientific studies to support her conclusions. In addition, Dr. Farley consulted with multiple other experts, such as Doctors Rios, Scribbick, Marsh, Camacho, and Six who evaluated Baby R and later testified for the State. Smita's experts had a difference of opinion, stating of Baby R had died from an accidental fall. However, that does not mean that the introduction of Dr. Farley's testimony about causation—that Baby R's death was caused by blunt force trauma—was an abuse of discretion by the trial court. The trial court properly performed its gatekeeping function following the *Daubert* hearing by allowing Dr. Farley's testimony to be presented to the jury once it felt that the underlying scientific theory was valid, the technique applying the theory was valid, and the technique was properly applied. *See Vela*, 209 S.W.3d at 133. Smita's fifth issue is overruled.

## V. No Error Regarding the Jury Charge

By her seventh issue, Smita argues the trial court committed reversible error by refusing to include definitions regarding voluntary conduct, concurrent cause, and mistake of fact in the jury charge instructions.

### A. Standard of Review

"In analyzing a jury-charge issue, our first duty is to decide if error exists." *Rodriguez v. State*, 456 S.W.3d 271, 280 (Tex. App.–Houston [1st Dist.] 2014, pet. ref'd.) (citing *Almanza v. State*, 686 S.W.2d 157, 174 (Tex. Crim. App. 1985) (op. on reh'g)). Only if error is found, do we then consider whether an objection to the charge was made and analyze for harm. *Id.* "The degree of harm necessary for reversal depends upon whether the error was preserved." *Id.* (citing *Hutch v. State*, 922 S.W.2d 166, 171 (Tex. Crim. App. 1996)).

If "an error is preserved with a timely objection.... then the jury-charge error requires reversal if the appellant suffered some harm as a result of the error." *Sanchez v. State*, 376 S.W.3d 767, 774 (Tex. Crim. App. 2012) (citing *Almanza*, 686 S.W.2d at 171). The Texas Court of Criminal Appeals "has interpreted this to mean that any harm, regardless of degree, is sufficient to require reversal." *Rodriguez*, 456 S.W.3d at 280.

The failure to preserve jury-charge error is not a bar to appellate review but rather establishes the degree of harm necessary to the reversal. *Warner v. State*, 245 S.W.3d 458, 461 (Tex. Crim. App. 2008) (citing *Almanza*, 686 S.W.2d at 171). To establish harm, the "appellant must have suffered actual, rather than theoretical, harm." *Warner*, 245 S.W.3d at 461. Neither the State nor the appellant bears the burden on appeal to prove harm. *Reeves v. State*, 420 S.W.3d 812, 816 (Tex. Crim. App. 2013).

### B. Applicable Law and Discussion

"A defendant is entitled, upon a timely request, to an instruction on any defensive theory raised by the evidence, provided that (1) the defendant timely requests an instruction on that specific theory, and (2) the evidence raises that issue." *Rogers v. State*, 105 S.W.3d 630, 639 (Tex. Crim. App. 2003). "To preserve error for appellate review, the defendant must sufficiently identify the defensive theory for which she seeks an instruction." *Id.* at 639–40. The evidence can raise a defensive theory if "weak or strong, unimpeached or contradicted, and regardless of what the trial court may think about the credibility

of the evidence." *Granger v.* State, 3 S.W.3d 36, 38 (Tex. Crim. App. 1999). "This rule is designed to insure that the jury, not the judge, will decide the relative credibility of the evidence." *Id.* Smita asked for jury instructions relating to: (1) a voluntary act; (2) concurrent causation; and (3) a mistake of fact. *See* TEX. PENAL CODE ANN. §§ 6.01, 6.04, 8.02 (West, Westlaw through 2015 R.S.).

### 1. Voluntariness and Concurrent Causation

Section 6.01 of the penal code states that "a person commits an offense only if he voluntarily engages in conduct, including an act, an omission, or possession." *Id.* § 6.01(a). Section 6.04 of the penal code relates to causation and states: "A person is criminally responsible if the result would not have occurred but for his conduct, operating either alone or concurrently with another cause, unless the concurrent cause was clearly sufficient to produce the result and the conduct of the actor clearly insufficient." *Id.* § 6.04(a).

██ However, "an instruction on voluntariness under section 6.01(a) is necessary only if the accused admits committing the act or acts charged and seeks to absolve himself of criminal responsibility for engaging in the conduct." *Peavey v. State,* 248 S.W.3d 455, 465 (Tex. App.–Austin 2008, pet. ref'd); *see* TEX. PENAL CODE ANN. § 6.01.

██ There was no evidence presented by the defense in which Smita admitted to causing Baby R's injuries and was seeking to absolve herself of criminal responsibility. *See Peavey,* 248 S.W.3d at 465. Smita argues that Baby R could have rolled off the bed, thereby having concurrent causation in his injuries and death. Although the State's evidence centered on Smita's deliberate acts to injure Baby R, Smita testified that she placed Baby R on the bed next to

her and fell asleep. Although Smita argues that because she was asleep, her actions could not have been voluntary and she was entitled to the instruction, more was necessary to entitle her to the instruction. Therefore, it was not error for the trial court to reject the request for an instruction on voluntariness and concurrent causation.

### 2. Mistake of Fact

██ Smita also argues she was entitled to an instruction on mistake of fact. Section 8.02 of the penal code covers mistake of fact and states "it is a defense to prosecution that the actor through mistake formed a reasonable belief about a matter of fact if his mistaken belief negated the kind of culpability required for commission of the offense." TEX. PENAL CODE ANN. § 8.02.

██ However, "if the evidence viewed in a light favorable to appellant does not establish a mistake of fact defense, an instruction is not required." *Granger,* 3 S.W.3d at 38. There was no evidence presented that Smita claimed she was mistaken about the injuries that Baby R sustained. Smita presented evidence that she was mistaken that Baby R was asleep, but that does not change the culpable mental state required for the charge. We hold it was not error to reject the inclusion of a mistake of fact instruction in the jury charge. We overrule Smita's seventh issue.

## VI. INEFFECTIVE ASSISTANCE

By her eighth issue, Smita alleges her defense counsel was ineffective for not properly filing notice of her expert witness, Dr. Carlos Mattoli, thus causing exclusion of his testimony.

### A. Standard of Review and Applicable Law

To prevail on a claim of ineffective assistance of counsel, the defendant must meet the heavy burden of *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). Under *Strickland,* the defendant must show by preponderance of the evidence that: (1) counsel's representation fell below an objective standard of reasonableness; and (2) there is a reasonable probability that the result of the proceeding would have been different but for the attorney's deficient performance. *Id.* at 687, 104 S.Ct. 2052; *Jaynes v. State,* 216 S.W.3d 839, 851 (Tex. App.–Corpus Christi 2006, no pet).

Allegations of ineffectiveness must be "firmly founded in the record." *Thompson v. State,* 9 S.W.3d 808, 813 (Tex. Crim. App. 1999). A "convicted defendant making a claim of ineffective assistance must identify the acts or omissions of counsel that are alleged not to have been the result of reasonable professional judgment." *Strickland,* 466 U.S. at 690, 104 S.Ct. 2052. We look to "the totality of the representation and the particular circumstances of each case in evaluating the effectiveness of counsel." *Thompson,* 9 S.W.3d at 813. If the appellant fails to prove one prong of the test, we need not reach the other prong. *See Strickland,* 466 U.S. at 697, 104 S.Ct. 2052; *Garcia v. State,* 57 S.W.3d 436, 440 (Tex. Crim. App. 2001).

### B. Discussion

Smita claims her defense counsel was ineffective for not properly filing his notice of expert witness, Dr. Mattoli, with the district clerk and for not showing the trial court the faxed receipt to the District Attorney's Office as notice.

In evaluating the first prong of *Strickland,* counsel's competence is presumed and the defendant must rebut this presumption by proving that his attorney's representation was unreasonable under prevailing professional norms and that the challenged action was not sound strategy. *Kimmelman v. Morrison,* 477 U.S. 365, 384, 106 S.Ct. 2574, 91 L.Ed.2d 305 (1986). "A vague inarticulate sense that counsel could have provided a better defense is not a legal basis for finding counsel constitutionally incompetent." *Bone v. State,* 77 S.W.3d 828, 836 (Tex. Crim. App. 2002). The reasonableness of counsel's performance is to be evaluated from counsel's perspective at the time of the alleged error and in light of all the circumstances. *Id.*

During the guilt-innocence phase of the trial, Smita attempted to have Dr. Mattoli testify as an expert witness. The State objected because Dr. Mattoli was not listed on Smita's expert witness list and the State claimed it was surprised by the testimony.[7] Smita had filed two notices of expert witnesses with the district clerk's office, and Dr. Mattoli was not listed on either. Defense counsel stated that he had faxed notice to the State, but could not produce the confirmation sheet. The trial court sustained the State's objection to Dr. Mattoli, and Smita asked to make a bill of exceptions to present to this Court. During the bill of exceptions, Smita, through summary and direct testimony, presented Dr. Mattoli's general testimony. Although defense counsel admitted it was a mistake not to file a supplemental expert witness list, Smita was allowed to present other witnesses who provided testimony similar to that which Dr. Mattoli would have provided.

---

7. The State had previously filed its motion in accordance with article 39.14(b) of the code of criminal procedure asking for disclosure of any expert witnesses Smita intended to use. The trial court granted the motion. *See* Tex. Code Crim. Proc. Ann. art. 39.14(b) (West, Westlaw through 2015 R.S.).

Prior to the beginning of the punishment phase, defense counsel filed a "notice of State's material suppression of exculpatory or mitigating evidence" and requested that the trial court sanction the prosecution. Defense counsel was then able to product his copies of a cover sheet faxed to the State, which listed Dr. Mattoli as an expert witness. The State stated it had not received the fax cover sheet, and that the district court required motions to be filed with the district clerk in order to constitute notice. The trial court found there was no prior evidence of notice of Dr. Mattoli during the guilt-innocence phase of the trial and its ruling stood. The trial court also held the State did not knowingly mislead the trial court and found no *Brady* violation. *See Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963) (prosecution must disclose exculpatory evidence if it is material to either guilt or punishment). After proof of the fax had been submitted, the trial court allowed Dr. Mattoli to testify and present his conclusions during the punishment phase of the trial, as a verdict had already been rendered when defense counsel produced the fax cover sheet.

 Since Smita did not raise this issue in her motion for new trial, trial counsel has not had an opportunity to respond to the allegation, and "the record on direct appeal will not be sufficient to show that counsel's representation was so deficient and so lacking in tactical or strategic decision-making as to overcome the presumption that counsel's conduct was reasonable or professional." *Bone*, 77 S.W.3d at 833. "Rarely will the trial record contain sufficient information to permit a reviewing court to fairly evaluate the merits of such a serious allegation." *Id.* "Trial counsel should ordinarily be afforded an opportunity to explain his actions before being denounced as ineffective." *Rylander v.*

*State*, 101 S.W.3d 107, 111 (Tex. Crim. App. 2003) (citing *Bone*, 77 S.W.3d at 836).

Even though there was a motion for new trial hearing held, the issues were not raised in the motion, and therefore, trial counsel has not been given an opportunity to respond to these allegations against him. *See id.* A writ of habeas corpus would be the better method for submitting these allegations; then, trial counsel can adequately respond. *See id.*

Accordingly, we conclude that Smita did not meet her burden on her ineffective assistance claim to rebut the first prong of *Strickland. See* 466 U.S. at 668, 104 S.Ct. 2052. Smita does not explain why her trial counsel's alleged failure to disclose one expert was "unreasonable under prevailing professional norms." *Kimmelman*, 477 U.S. at 384, 106 S.Ct. 2574. Furthermore, when comparing Smita's bill of exception regarding Dr. Mattoli with the record of other witnesses' testimony, it is apparent that other witnesses presented similar evidence as what Dr. Mattoli would have testified to. Dr. Mattoli was later able to present his version of events before the jury during the punishment phase.

Smita's eighth issue is overruled.

## VII. NONDISCLOSURE OF EXPERT WITNESSES

By her ninth issue, Smita argues the prosecution committed misconduct by claiming Dr. Mattoli was a surprise witness, and the trial court committed error by not allowing Dr. Mattoli to testify once he explained his conclusions.

### A. Standard of Review and Applicable Law

 "We review a trial court's decision on whether to allow an expert witness to testify on an abuse of discretion standard." *Johnson v. State*, 233 S.W.3d 109, 114 (Tex. App.–Houston [14th Dist.] 2007,

no pet.). "A trial court abuses its discretion when its ruling is arbitrary, unreasonable, or without reference to any guiding rules or legal principles." *Id.* We must uphold the trial court's ruling if it falls within the zone of reasonable disagreement. *Id.*

Although case law regarding a defendant's failure to disclose the identity of a testifying expert witness pursuant to a pre-trial discovery order and what sanctions are required or permitted as a result of that failure are scarce, it was addressed by the *Johnson* Court, citing an unpublished opinion from the Fort Worth court of appeals. *See id.* (citing *Strawn v. State*, No. 02–02–00170–CR, 2003 WL 21235537 at *2–4 (Tex. App.–Fort Worth, May 29, 2003, pet. ref'd) (not designated for publication)). In *Strawn*, the Fort Worth Court of Appeals found that "the trial court did not abuse its discretion when it excluded the defendant's expert psychologist from testifying during the punishment phase of the trial." *Id.* at 115 (citing *Strawn* 2003 WL 21235537 at *2–4). In *Johnson*, the defendant had not complied with the trial court's discovery order regarding use of expert witnesses, and the State objected based on lack of notice. *See id.* at 114–15. *Johnson* rationalized that in *Strawn*, the Fort Worth Court utilized the same test used when the prosecution fails to notify the defense of expert witnesses. *See id.* at 115. "This test encompasses two factors: (1) whether the party's action in failing to timely disclose the expert witness constituted bad faith; and (2) whether the opposing party could have reasonably anticipated that the undisclosed witness would testify." *Id.*

### B. Discussion

We will also follow the test used in *Johnson*. *See id.* We do not find that defense counsel acted in bad faith by his failure to disclose Dr. Mattoli. However, the State objected that Dr. Mattoli was a surprise witness, and the trial court sustained the objection.

Although defense counsel was able to produce a fax cover sheet that showed transmission of Smita's expert disclosure to the State prior to the start of the punishment portion trial, we hold the State did not commit misconduct by stating to the trial court during the guilt-innocence portion of trial it did not have notice. In a hearing outside the presence of the jury, the trial court allowed Dr. Mattoli to testify, but also found defense counsel had presented no evidence during the guilt-innocence phase that notice was given and the trial court's ruling stood. The trial court also found that the State did not commit any violations of misconduct by stating they had no notice. *See Brady*, 373 U.S. 83, 83 S.Ct. 1194.

Smita argues she preserved error during the guilt-innocence phase of the trial by creating a bill of exceptions regarding Dr. Mattoli. Assuming without deciding error was preserved, we find the error of granting the State's objection to Dr. Mattoli was harmless. The evidence shown during the bill of exceptions and later during the punishment phase of the trial was cumulative and repetitive of other defense witnesses. *See Guerra v. State*, 942 S.W.2d 28, 33 (Tex. App.–Corpus Christi 1996, pet. ref'd). We overrule Smita's ninth issue.

### VIII. Conclusion

Having overruled all of Smita's issues, we affirm the judgment of the trial court.