

# NUMBER 13-24-00145-CR

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI – EDINBURG

---

**SERGIO ADRIAN CONTRERAS**                                    **Appellant,**

**v.**

**THE STATE OF TEXAS,**                                              **Appellee.**

---

## ON APPEAL FROM THE 36TH DISTRICT COURT
## OF SAN PATRICIO COUNTY, TEXAS

---

## MEMORANDUM OPINION

**Before Justices Silva, Cron, and Fonseca**
**Memorandum Opinion by Justice Cron**

Appellant Sergio Adrian Contreras was convicted by a jury of one count of continuous sexual abuse of a child, a first degree felony for which he was sentenced to fifty years' imprisonment. *See* TEX. PENAL CODE § 21.02(b), (h). In four issues, he argues: (1) the jury charge contained several errors that caused him egregious harm; (2) the evidence is legally insufficient to prove he committed the offense because "there is not

enough evidence for the jury to determine that two acts of sexual abuse occurred more than thirty days apart"; (3) the trial court improperly prohibited him from questioning jurors who had identified themselves as victims of sexual assault or as close family members or friends of a victim of sexual assault; and (4) the State engaged in prosecutorial misconduct during the course of the trial and in closing arguments that impeded his right to a fair trial. We affirm.

## I. BACKGROUND[1]

### A. Indictment

The indictment alleged that:

> [Appellant] on or about the 1st day of January 2014, and anterior to the presentment of this Indictment, in the County and State aforesaid, did then and there, during a period that was 30 or more days in duration, namely from on or about the 1st day of January, 2014, through the 31st day of December 2015, when the [appellant] was 17 years of age or older, commit two or more acts of sexual abuse against children younger than 14 years of age, namely, with intent to arose or gratify the sexual desire of the [appellant], engage in sexual contact with [K.V.], by touching the genitals of said child; and/or intentionally and knowingly causing the penetration of the sexual organ of said by the [appellant's] finger; and/or intentionally and knowingly cause the penetration of the mouth of [C.V.], a child, by the [appellant's] sexual organ.

### B. Jury Trial

Appellant's heavily-contested trial spanned five days from February 5, 2024, to February 9, 2024. Eleven witnesses testified and several exhibits were admitted into evidence. We include the facts relevant to the issues raised in this appeal below.

---

[1] To protect the identity of the children, we refer to them and their family by pseudonyms. *See* TEX. CONST., art. I, § 30(a)(1) (providing that a crime victim has "the right to be treated . . . with respect for the victim's dignity and privacy throughout the criminal justice process"); TEX. R. APP. P. 9.10(a)(3) (protecting the privacy of "any person who was a minor at the time the offense was committed" by designating the minors' names, dates of birth, and home address as "[s]ensitive data" requiring redaction); *see also Perez v. State*, 689 S.W.3d 369, 374 n.1 (Tex. App.—Corpus Christi–Edinburg 2024, no pet.) ("Out of an abundance of caution, we will also use initials to identify her immediate family members.").

2

**C. The State's Case-in-Chief**

**1. Rebecca Cole**

Rebecca Cole, a student wellness interventionist,[2] testified that K.V. was referred to her on April 20, 2021, because of "some self-harm." During an assessment, K.V. reported to Cole that seeing her uncle a few days ago "triggered" her thoughts. The following pertitent exchange then ensued:

> [State]:    Did she state anything else?
>
> [Cole]:    Yes ma'am. Do I need to—
>
> [State]:    Yes.
>
> [Cole]:    —go ahead and read my case notes? She reported that when she was six or seven her uncle sexually assaulted her. He would bribe her with toys. Her mother was called. As she recounted the memory, she stated her uncle would call her into his room after the Mom . . . would leave. No other adults in the house. He woud lick his fingers and put them inside of her, touched her down there. He would make her climb on top of him and tell her to jump up and down while he just laid there. He told her not to tell anyone.

Cole indicated that apart from identifying the abuser as her uncle, K.V. did not identify him by name.

**2. Alicia Woolridge**

On June 1, 2021, Alicia Woolridge, a forensic interviewer who works with the Harris County Children's Assessment Center (CAC), interviewed both K.V., who she believed was thirteen at the time, and C.V., who she believed was fourteen at the time. When asked whether K.V. stated anything with respect to sexual abuse, the following exchange

---

[2] Cole characterized her role as "like a crisis counselor."

occurred:

> [Woolridge]: May I review my notes?
>
> [State]: Yes.
>
> [Woolridge]: So, K.V. disclosed touching of her breast under the clothes. She disclosed rubbing of her vagina under her underwear, she disclosed her uncle licking his finger and putting—putting—she initially disclosed her uncle licking her (sic) finger and putting it in her underwear— in her vagina, and then later in the interview when attempts for clarification were made, she stated that she wasn't sure if what we would call digital penetration, if that occurred or not.

Woolridge explained that K.V. also disclosed "[appellant] having her get on top of him and jump" and "playing a movie with sex scenes." K.V. said this occurred "[o]n two occasions." Woolridge clarified that K.V. indicated that appellant rubbed K.V.'s vagina "[u]nderneath" her clothes, and licked "[h]is finger." Woolridge further testified that while K.V. initially indicated that he "put" his fingers "in her vagina"[3] she later indicated she did not "know if he stuck it in me or not, but he just rubbed on me, on my vagina." She explained that K.V. also mentioned that when her uncle rubbed her vagina, she talked about "itching and burning."

When asked whether "delayed outcries" are common, Woolridge said, "very common." According to Woolridge, K.V. indicated the abuse happened in "her uncle's room" at her "mom and dad's or her home in Aransas Pass." when she was "[a]bout seven years old." Additionally, Woolridge testified that when she asked K.V. how many times this occurred, K.V. "indicated more than once, but she did not clarify the type of acts that

---

[3] We observe that Woolridge also said the K.V. "may have called it a different name."

happened more than once."

Woolridge testified that C.V. "stated that the same uncle put his thing up her mouth," and this occurred in his bedroom in Aransas Pass when appellant lived with them. According to Woolridge, C.V. clarified that "thing" was a "place where men pee" and she discussed feeling "grossed out and almost throwing up." C.V. told Woolridge that "[h]e didn't let me throw up because he said, [k]eep going, but I didn't want to, but he said keep going." C.V. described to her that her mouth "felt nasty." C.V. further described to her that she could taste "wet, like stuff coming out; I don't know what it was." [C.V.] talked about her clothes coming off, but she did not narrate any other incidents."

Upon Woolridge being asked how C.V. described her clothes coming off, the following exchange ensued:

| [State]: | How did she say her clothes came out—came off I guess? |
|---|---|
| [Woolridge]: | I'm going to go back and find it in my notes. So I'm going to kind of back up to make it flow, if that's okay. |
| [State]: | That's fine. |
| [Woolridge]: | The first question I asked her was, Tell me what you came to talk to me about. She stated, ["]I'm not sure, about what happened in our past.["] I asked her, What happened in your past? She stated, ["]Me and my sister were child-abused, I think, by our uncle.["] I asked her, Tell me your uncle's name. She stated[, "]Sergio Vargas Contreras. I think because it's my Mom's brother.["] I asked her, How many times were you child-abused? She stated, ["]Once.["] And then I asked her, Tell me all about that one time, start from the beginning and work me through the end. She stated, ["]Like how many days?["] I said, How many times has he abused you? Then she stated, ["]I am not sure, but I remember he did.["] Then I asked her, Tell me everything you do remember. And she stated, ["]I remember that he put |

5

his thing up my mouth and I am not sure if he touched me, but he did take off my clothes and I am really nervous. I am sorry.["]

When pressed by appellant's counsel whether it would be useful for a jury to look at any qualifying language used by a child during an interview, Woolridge encouraged considering the interview as a whole as opposed to parts of it. Woolridge testified that she did not count the number of times that C.V. said, "I think" or "I'm not sure," but both were said more than once. She also did not recall how many times, C.V. said "I don't remember."

Video recordings of K.V.'s and C.V.'s forensic interviews were admitted into evidence.

### 3.    Dr. Marcella Donaruma

Dr. Marcella Donaruma, a pediatric doctor board certified in a subspeciality of child abuse pediatrics, testified that she works through the Children's Advocacy Center in Harris County. She explained that she works in the medical clinic seeing patients who are referred for a medical evaluation due to an outcry of childhood sexual abuse or a concern of being at risk for sexual abuse.

Dr. Donaruma described that when children are abused at a young age, it can "create a fuzziness" as to some of the details. When asked, "Now, the fact that [children] say, [']I don't remember, I don't think so,['] does that necessarily mean they're being untruthful about what happened to them sexually[,]" she responded, "No. In general, what we learned is that kids do misrepresent abuse events. It's typically by mimizing the accounts rather than fabricating things that never happened."

As to meeting with K.V. and C.V., she explained that she met with them at the clinic

6

in 2021.[4] Dr. Donaruma learned during her interview with K.V. that she was "endorsing [sic] flashbacks" and was also "cutting herself" though she had gone for about three to four weeks without having the "impulse" to do that. In regards to the sexual abuse, the following exchange ensued:

[State]: All right. And what was that?

[Dr. Donaruma]: So [K.V.] had disclosed that the person who had touched her was her Uncle Sergio and then she discussed in detail with me that he had his own room because he was staying in her Mom's house and, of course, she was also there and he would drag her in his room. She didn't want to, but he would force her in his room and he would touch her. He would touch her with his hand and his hand would grab her front part. I clarified that the front part is where the period comes from and she said, yes, that was right. And then I asked where her clothes were when that happened and she said they were still on and then she said he would just stick his hand underneath and then I asked where his clothes were and she said his were on. I asked if he ever touched her with anything else besides his hand and she said basically that's it. I asked if he touched her with anything—anything besides her front part and she said her chest. I asked if she ever had to touch him and she said I don't think so. I asked if he wanted her to tell anyone what had happened and she said he didn't really mention it, he just kept doing it. I asked[,] when it started. She said I think I was seven. I asked if she remembered when it stopped. And she said, When he moved out or he traveled. I was still seven and I think I wasn't going to school, like it was summer. I asked how it felt of her when that was happening . . . and she replied that it made her feel really grossed out and uncomfortable, so it gave me like her feelings, not bodily sensations. I asked if she saw anything afterwards that made her worry her body had been hurt by what he did and said no. I asked if he took any pictures or videos of her body and she said no. I asked if he showed pictures or videos of other people's bodies and she said no. And I asked if anyone else ever touched her in a way she didn't want to have happen and she said no.

[State]: Did [K.V.] say where they were living at the time?

---

[4] Medical records from this meeting with K.V. and C.V. were later admitted into evidence.

[Dr. Donaruma]:     In her Mom's house.

After the interview, Dr. Donaruma testified that K.V. did not agree to a physical examination, and, as to a diagnosis for K.V., Dr. Donaruma testified, "she had disclosed sexual abuse[.]" When asked whether there were certain indicators in a child's behavior that corroborates sexual abuse, Dr. Donaruma testified that the "best indicator that sexual abuse has occurred is a clear disclosure from the child whose elements are consistent over time." She agreed that cutting, depression, and suicidal thoughts are "non-specific" symptoms of some children that have been sexually abused.

As to C.V., Dr. Donaruma testified that "she did not endorse any behavioral symptoms" nor were any reported by C.V.'s mother. In regards to sexual abuse, the following exchange ensued:

[State]:            No, I understand. Now, what—what sort of history did [C.V.] give you with regard to behavior—to what happened to her?

[Dr. Donaruma]:     She said when she was younger, her and her sister got child-abused and she said her uncle ["]put his thing, his down part, he put it in her mouth. Well, I don't know about my sister, but me, he put it in my mouth,["] is a quote I put here. I asked if anything came out of his down part when he did that and she said, ["]Yeah, I don't know what it's called.["] I asked, Where did it go? She said, ["]I tried to barf it out, but he wouldn't let me. It was nasty. It felt gross and it like—it made me want to barf it out, but he didn't let me. He said, Just keep going.["] I asked how many times that happened and she said, ["]Um, I don't remember.["] I asked if she remembered when it started. She said, ["]I was maybe—when I was six, maybe six or seven.["] I asked if she remembered when it stopped. She said, ["]When we moved like four years ago.["] I asked, Did his part touch you anyplace else besides your mouth? She said, ["]I don't remember.["] I asked, Did he ever ask

8

you to touch him? She said, ["]No.["] I asked, How did you know that? And she said, ["]Because people might tell on him.["] I asked, Did he take any pictures or videos of your body? She said, ["]No.["] I asked if he showed her pictures or videos of other people's bodies? She said, ["]No["]. And I asked if anyone else had ever touched her in a way she didn't want and she said no.

Dr. Donaruma conducted an examination on C.V. but found no trauma at that time. Dr. Donaruma also tested for body fluids exposure and "it was all negative." Dr. Donaruma testified that the Harris County Children's Assessment Center's policies on what it considers penetration is a "violation of the plane of the labia majora, however slight. So, essentially if the two pieces of skin on either side of the vulva are moved, that is penetration." When asked "So, the outer lips of the vaginal area, just going past that however slight, that's considered penetration?" Dr. Donaruma answered, "Yes."

When presented with a scenario in which a child witness provides an inconsistent answer to the same question to different people, Dr. Donaruma could not say whether such inconsistency would tend to corroborate or refute a child-abuse allegation because "you're talking about different audiences for that outcry." Additionally, she explained that when a person is under stress, hormones are released that circulate through the body and disrupt the processes the brain uses to collect, synthesize, and store information. She also conceded that fragmented memories do not always accurately represent the thing that happened and a fabricating child-witness could look and act the same as a child-witness that is truthful. She testified that there is no typical behavior that you would expect from a child that has been abused and there is no typical way for a child to interact with an alleged offender.

9

During cross examination, Dr. Donaruma was questioned about when K.V. indicated the sexual abuse stopped, and the following exchange occurred:

[Appellant's counsel]:    You asked her if she remembered when it stopped, correct?

[Dr. Donaruma]:    Yes.

[Appellant's counsel]:    How old did she say that she was when this stopped?

[Dr. Donaruma]:    She thought she was still seven and I—["]I was still seven and I think I wasn't going to school, like summer,["] is what she said.

[Appellant's counsel]:    Okay. So [K.V.] is basically saying that this all happened, started and stopped, when she was seven years old,—

[Dr. Donaruma]:    Yes.

[Appellant's counsel]:    —correct? Okay. You asked her if he had taken any pictures or videos of her body. What was her answer there?

[Dr. Donaruma]:    No.

Dr. Donaruma was similarly asked about when C.V. indicated the sexual abuse stopped, and the following exchange occurred:

[Appellant's counsel]:    You also asked C.V. when her abuse was alleged to have started, correct?

[Dr. Donaruma]:    Yes.

[Appellant's counsel]:    And her answer was, ["]When I was six, maybe six or seven;["] correct?

[Dr. Donaruma]:    Yes.

[Appellant's counsel]:    What was her response when you asked her when it stopped?

10

| [Dr. Donaruma]: | She said, ["]When we moved, like four years ago.["] |
|---|---|
| [Appellant's counsel]: | When we moved, like four years ago implying maybe roughly four years before when this interview take place? |
| [Dr. Donaruma]: | Yes, like roughly 2017. |
| [Appellant's counsel]: | Roughly 2017. And was it your take on that question and these answers that her abuse had continued through six or seven up through 2017. |
| [Dr. Donauma]: | Yes. |

### 4. Andrea Torres

Andrea Torres testified that she is the Director of Human Resources for Berry Contracting, LP, d/b/a, Bay, Limited (Bay). Through Torres, the State admitted records that contained pre-employment and on-boarding paperwork for appellant. Torres testified that "with the type of work that we do at Bay, it is contract-driven so an employee is hired for a specific job at a specific point in time. Once the job finishes . . . that employee is normally laid off." So if a new job arises and they get hired for it, "they could get hired multiple times during the course of years." The earliest record she has for appellant is 2012. Within the records, there were several applications and for the 2012, 2014, 2015, and 2016 applications appellant listed his "present address" as "333 North 10th Street, Aransas Pass, Texas."

During cross examination, Torres explained that these records do not show the location of appellant's job sites. But on re-direct, Torres explained there was a mention in the per diem records that the job sites were in Texas. She confirmed that employees do get days off but she did not know the particulars for each job. On re-cross, she confirmed

11

that the present address could be where employees receive mail in order to qualify for per diem, as Bay usually requires a utility bill that matches the address employees are providing. She did not locate a copy of a utility bill in the records.

### 5. Captain Troy Poe

Captain Troy Poe with the Aransas Pass Police Department (APPD) explained that in 2021, he was assigned as a detective with Criminal Investigations. This case, he explained, was transferred from Baytown Police Department, which did the initial investigation because the family was living in that area during that time, but the address where the incident occurred was "333 North 10th Street in Aransas Pass, San Patricio County, Texas."

During cross examination, Captain Poe explained he did not seek out other witnesses, as there were no other witnesses to the offense in the eyewitness interviews. He did not take pictures or visit the Aransas Pass property and explained it had been abandoned for a number of years by this point and heavily damaged by Hurricane Harvey. After reviewing everything from the Baytown investigation, Captain Poe concluded that the period of abuse was from 2014 to 2015 based on the complainants' statements, but he acknowledged that Mother had indicated the period to have been from 2012 to 2013. He also explained that he found three instances where appellant had contact with APPD between "2013 and 2016," and in each case, "I found him using that address [of the offense in each of these incidents] and being inside the city." Captain Poe did not ask Mother where appellant worked when the incidents allegedly occured.

12

**6.     Mother**

Mother, K.V.'s and C.V's adoptive mother[5] and appellant's younger sister, testified the girls were born ten months apart and she obtained custody of them after her half-sister, who was living with her in a mobile home in Aransas Pass, "took off to Mexico and . . . never came back." She testified that she moved into the mobile home around 2008 but it was later destroyed by Hurricane Harvey.[6] It had two bedrooms; one bedroom shared by her, her husband, and the girls, and the other one occupied by appellant. She explained appellant came to live with her probably around 2010, 2011, or 2012 and he stayed "off and on."

Mother testified that appellant moved from Washington to live with them so he could "get on his feet." Around 2012 to 2014, she was working part-time shifts at H.E.B. and going to Del Mar College in Corpus Christi. In 2015, she began working full time at a different job, and in 2016 she, along with the girls, moved from Aransas Pass to Louisiana. C.V. and K.V. did not see appellant again until Christmas 2020, when he and a "lady friend" visited them for about a week in Baytown where they were living at that time. Mother testified that during this holiday she was sick with COVID-19, and the girls seemed like they were happy to see appellant. She did not see appellant again until April of 2021.

When asked to explain to the jury why they were there on the day of trial, Mother testified as follows:

[Mother]:                    On April 20, 2021, I . . . received a phone call from school. It was one of the counselors at my daughter, [K.V.]'s middle school. All she said was ["K.V.] has

---

[5] Mother also testified that she has one biological child with her husband, and that K.V. and C.V.'s biological father is deceased.

[6] We note that Mother testified that it may have been remodeled but she never went back.

13

been a little bit anxious today. She's not well. Please come in.["] I said, Okay. I went in immediately and the counselor told me ["]that there was something very important that I needed to know["] and she let [K.V.] speak. And [K.V.] said, ["]Mom, I was molested by my uncle.["] At that moment, I felt like literally a bucket of cold, cold ice fell on my head. I said, What? She said, ["]my uncle, Checko,["] which is what they call Sergio, ["]touched me when I was smaller.["] I said, "When was this? When did this happen? Recently, he had—he had actually been at the house that day, I believe. He hadn't been there in awhile. That day, he had come in from Mexico. He was going to catch a plane back to Washington. He stopped by the house, in and out, and he left.

[State]:  And I'll stop you real quick. And what day was that?

[Mother]:  I want to say it was Monday when he came in and it was the same Monday or the next day when she told the counselor.

[State]:  Okay.

[Mother]:  But it was between those two days.

[State]:  Okay. And so . . .[appellant], came to your house?

[Mother]:  Yes.

[State]  How long was he there?

[Mother]:  He was there just a few hours.

   . . . .

[State]:  And [K.V. and C.V.] both saw him?

[Mother]:  They both saw him.

Mother also testified that the following conversation occurred with K.V. before C.V. arrived home from school:

[I] asked [K.V.], Tell me what happened. When did this happen? And she

14

said, ["]When I was smaller like seven or eight.["] I said, Why until now? What took you so long? She's like, ["]I don't know. I didn't know how to tell you. I didn't know what was right from wrong.["]

. . . .

[I] said, Okay, well you told me now so we're going to take care of it. I asked her some questions. I said, Has anybody else ever touched you? Has—And I start giving names of people that have been around us or near our family. I gave her all the names in the book I could possibly think of. She said, ["]No.["] I said, And you're positive it was Sergio? She said, ["]Yes, it was him.["] How—I told her, How many times did this happen? She said, ["]I don't know. *It happened a lot of times.*["] I said, Where? She's like, ["]When we were in the trailer.["] I'm like, Where was I? ["]You were at work.["] What about your Dad? ["]He was outside.["] What about my Mom? Because my Mom was—sometimes she was there, sometimes she was in Mexico, sometimes she was there, sometimes she was in Mexico. [K.V.] [s]aid, ["] She wasn't there.["] We—I asked what he did to her. She—She told me all the gruesome things he did, the way he would touch her, the way she would—he would have her touch him, how he would tell her to sit on him and rock herself back and forth while he was on the bed. Just so many things that it's very hard to hear from a child, especially when it's your child. . . . And when it's your brother.

(Emphasis added).

Mother testified the following conversation ensued when C.V. arrived home shortly thereafter:

[C.V.] said, ["]What's going on? Why wasn't my sister on the bus?["] I said, Your sister just told me what happened with Sergio. Did Sergio do this to you, too? She did not hesitate. She said, ["]Yeah, he did.["] I said, Why? Why didn't you tell me? I couldn't [sic] have helped you. I could have done something for you a long time ago. You didn't have to live with this for so long. She said, ["]I don't know. I don't know.["]

Mother described K.V.'s demeanor as "torn" and "very depressed." She recalled that a few days earlier, K.V. had expressed to her not wanting them to go anywhere because she saw a TikTok that said it is "National Rape a Woman Day" and she did not want us to get "raped."

15

Mother testified that C.V. told her that he would "touch her, that he would lick his fingers and touch her vagina" and, that he would "sit her on top of him." Mother also asked C.V. "if he had put his finger inside of her," and she replied "'No, I don't think he did. He touched me. He would make me put my mouth on his penis and he would laugh about it and he said he would bring us toys if we didn't say anything. And he brought toys.'" C.V. also told her mother that appellant "would make her suck on his penis. She did say once that he ejaculated and that he would laugh." C.V. reported that this happened when she "probably seven or eight."

Mother also explained that K.V. reported "that [appellant] would lick his fingers, touch her down there, make her sit on him . . . over his private part and have her rock back and forth on him." Mother testified that both girls told her the abuse happened "a lot of times." She testified that she had no issues with her daughters being untruthful, and that at the time of the outcry, they were living in Baytown.

During cross examination, Mother conceded she could not recall word-for-word what K.V. said to her at the school, but she was confident that K.V. "basically" told her that "she had been molested by [appellant]." As to details, Mother testified that K.V. said "he had touched her on her private part, that he had sat her . . . on his lap when he was in bed and would make her rub on him, [and] that he would also make her put her mouth on him." And C.V. said, "[p]retty[ ]much the same thing, that he had touched her, that he had her put her mouth on him, suck on his penis, that he would touch her and that it happened multiple times."

A video recording of her interview with a detective in Baytown was played for the jury and she did not agree that what she told the detective was different than her

testimony. Mother explained, "They were both touched and that's what I told the [d]etective." She conceded, however, that she did not mention to the detective about either one of the girls alleging that they were using their mouths on appellant. But she explained she was a "bundle of nerves and a bundle of sadness." Mother confirmed, as stated in the video, that the girls indicated these incidents happened for several months. On redirect, she explained she considers herself a strong person but the day she learned of the abuse, she "broke down" and conceded it was possible that she merged facts about what each child said. "At the end of the day, to me, is that they were both [inappropriately] touched."

### 7.    K.V.

K.V., fifteen at the time of trial, testified that appellant lived with her and her family in Aransas Pass in a two bedroom mobile home when she was younger. She explained that appellant, who she agreed was sometimes there and sometimes not, her dad, her grandmother, who would come "in and out" from Mexico, and her two sisters lived in the home. However, she could not recall if her little sister was born yet at this time. She explained that she, Mother, her dad, and C.V. slept in one room, and appellant in the other. Her grandmother would sleep on the couch. She recalled having a discussion with Cole in 2021 about appellant, and when asked about specifics the following exchange occurred:

[K.V.]:     Um, [appellant] would tell me to come in his room and later on he would buy me a toy, and would sit on the corner of his bed and he would—he would lick his fingers and put it in my private area and then another time he called us from the living room and he was laying on the bed and he told me to get on top of him and he would start, like jumping up and down kind of.

17

[State]:     You were jumping up and down on him?

[K.V.]:     No. He was, like, kind of like grabbing onto my waist like making me jump.

[State]:     And what was his position on the bed?

[K.V.]:     He was, like, laying down with his legs up.

[State]:     And where were you sitting?

[K.V.]:     On his lower stomach.

[State]:     Okay. And that was another incident?

[K.V.]:     Yes.

[State]:     You stated—Before this, you stated—you stated he calls you into his room?

[K.V.]:     Yes.

[State]:     Okay. Where were you, do you remember?

[K.V.]:     In—In the living room.

[State]:     Do you remember what you were doing?

[K.V.]:     We were watching a movie.

[State]:     Did he call you by yourself?

[K.V.]:     Um, I think he called my sister in first.

[State]:     Okay. And then was your sister there at the same time or—

[K.V.]:     No.

[State]:     Okay. You went in after?

[K.V.]:     Yes.

[State]:     So when you were in the room with him, were you by

18

yourself?

[K.V.]: Yes.

[State]: Okay. Was—Do you recall if this was during the day or during the night?

[K.V.]: It was, like, in the afternoon.

. . . .

[State]: Now, you talked about the—a time that he called you into his room and you talked about him, I guess, you said licking his fingers and put—where did he put it?

[K.V.]: In my private area.

[State]: Okay. And what do [sic] he do with your private area?

[K.V.]: He would just, like, rub it.

[State]: He would rub it, okay. Did—Was it both on the outside and the inside?

[K.V.]: The inside.

[State]: How did that feel? Do you remember feeling anything?

[K.V.]: I don't remember anything at the moment, but afterwards it's like—really itches and burned to pee.

. . . .

[State]: Okay. That incident where he—where he licked his fingers and put them in your private, what—how many times did that happen?

[K.V.]: I only remember once.

[State]: Okay. And what about the incident where he bounced you—

[K.V.]: Once.

[State]: Okay. Was that sometime later?

19

| [K.V.]: | Yes. |
| | . . . . |
| [State]: | Okay. Was that, I'll see if I can remember, was that—what about when he bouned you? |
| [K.V.]: | It was once. |
| [State]: | One time. And how much later was that as far as after the incident where he licked his fingers and put it in—in your private? |
| [K.V.] | That was, like, way after. Wasn't right after. |
| [State]: | A few weeks, months later? |
| [K.V]: | Months. |
| [State]: | Okay. Do you remember—Okay. Now, do you remember how old you were? You may not, but if you can approximate how old you were when this happened? |
| [K.V.]: | Six, maybe seven. |

K.V. testified that she talked to Cole because there was

a thing on "TikTok [called] National Rape a Girl Day—and I was just like really freaked out by that and it was like—I can't remember if it was before or after my uncle had come from somewhere and he was staying with us for a little bit and I was just—it was just so kind of there and I—I felt really bad and I had to tell someone.

K.V. agreed that she had been struggling with depression and cutting her arms. She recalled seeing appellant at Christmas in 2020 with his "boss named [Smith]" and that caused her some stress but she did not say anything then. Her grandmother, she explained, does not believe the girls' accusations and has "definitely showed that she doesn't like us."

20

During cross examination, she explained that appellant's room was empty when he was not there, and her grandmother would still sleep on the couch. With respect to the incident in which appellant called her into his room, she did not know whether appellant called her and C.V. one at a time. Further, when appellant had her go up and down, she agreed she was sitting on his lower stomach and she was fully clothed but his pants were "unzipped" and they were not buttoned. She stated she was "[a]bove" his pant-line, and he had underwear on. She agreed she did not see his penis.

When K.V. was asked, "[w]hen you say, put inside, and then you said, just rub it, are you talking about when you're saying that he would lick his finger and rub your down part, your vagina," she said, "Yes." When asked why she described standing up when appellant rubbed her vagina in trial versus sitting on his knee in the forensic interview, she stated, "I think they were different times they happened." She agreed that she did not tell the doctor that appellant put anything inside her. K.V. also explained that if she did not mention him bringing toys to one but did mention it to the other, "I probably forgot it." She agreed that she told Dr. Donaruma that this stopped when she moved four years ago, but at trial she stated it did not happen when she was ten. After watching her forensic interview, she agreed that there are many different statements from her testimony given the day prior.

Regarding the 2020 Christmas holiday, K.V. did not remember watching movies with appellant, Wendelin Smith (Smith) and C.V., running into appellant's room and wrestling with him, or having a popcorn fight during this time. She confirmed on redirect that what she said in her forensic interview was the truth. K.V. did not remember the exact dates of the sexual abuse or how old she was, apart from being young.

21

**8.     C.V.**

C.V., sixteen at the time of trial, testified that appellant lived with them for a time in a "little trailer" with two bedrooms in Aransas Pass. She explained appellant had his own room, and that she slept in the same room with K.V., Mother, her dad, and maybe her little sister. She further explained her grandmother also lived there and slept on the couch but agreed she would visit family in Mexico as well. When asked whether there was ever a time when she lived in Aransas Pass that appellant did something to make her uncomfortable, the following exchange ensued:

[C.V.]:          [Appellant]—If we asked for something, like anything, he would make us do inappropriate stuff.

[State]:         Okay. What do you mean, inappropriate stuff?

[C.V.]:          He would make me touch on his private part and—and suck on it.

[State]:         Okay. And how did you touch his private part?

[C.V.]:          I grabbed on it, and I went like that. (Demonstrating.)

[State]:         So you moved—you moved it with your hand up and down, is that what you're saying?

[C.V.]:          Yes.

[State]:         When you touched it, were you touching—was his clothes off or on?

[C.V]:           His clothes were off.

                 . . . .

[State]:         What did it feel like?

[C.V.]:          It felt gross, and like, slimmy.

[State]:         Do you remember how old you were?

22

[C.V.]: I think six or seven.

[State]: You also say—stated that he made you suck on it. What do you mean by "it"?

[C.V.]: On his private part.

[State]: Is that the part that he pees from?

[C.V.]: Yes.

[State]: How did—Explain to us how that happened.

[C.V.]: Like how?

[State]: What—What did he ask you to do or how did it—where were you, how did it happen?

[C.V.]: Like, anytime like we would ask him for something, we had to like, um—um, pleasure him.

[State]: Okay. What kind of things did you ask for?

[C.V.]: Mostly like toys or food.

[State]: When you said—When you stated he made you suck on it, where was—where was his—his private part?

[C.V.]: What do you mean?

[State]: Was it in your mouth?

[C.V.]: Yes.

[State]: Okay. And how did that feel?

[C.V.]: It felt—

[State]: What did you feel?

[C.V.]: It felt gross. I felt like throwing up.

[State]: Did you feel anything else during that time while that was happening?

23

[C.V.]: Like what?

[State]: Was there any—Did you feel any liquid or anything like that?

[C.V.]: Yes.

[State]: Talk to—Talk to us about that.

[C.V.]: I was, um, sucking on it, and um, he—I felt liquid come out and I told him, like, I felt like I wanted to throw up and he said, ["]keep on going.["]

[State]: Where were you when this happened?

[C.V.] In his room.

. . . .

[State]: Okay. And so when this particular thing happened, do you recall—or maybe what age you were?

[C.V.]: Maybe seven or six.

[State]: And do you recall how many times that happened where he had you suck on his private part?

[C.V.]: No, I don't remember.

[State]: Was it more than one time?

[C.V.]: Yes.

[State]: Okay. Did it happen over a time period of over two weeks, two months?

[C.V.]: Yes.

[State]: Months?

[C.V.]: Yes.

[State]: Which one?

24

> [C.V.]:  Like more than weeks.

During cross-examination, she agreed that there were several things said at trial that she did not say in her forensic interview. She did not witness K.V.'s abuse, but she did see K.V. get called from the living room into appellant's room. C.V. also agreed that she went into more detail in her testimony than she had to other people. The video recording of her forensic interview was played for the jury.

C.V. explained that during Christmas 2020, she remembered going with appellant and K.V. to the gas station, appellant buying them food, watching movies, and coming back with a "white dog" after going to the park or on a walk. On re-direct, she testified that watching the forensic interview did not refresh her memory, but agreed that everything she testified to was true. She explained the girls "were scared" when they saw appellant in 2020 at Christmas time.

## D.  Appellant's Case-in-Chief

### 1.  Wendelin Smith

Smith testified that she knew appellant because they worked at the same pear picking plant in Cashmere, Washington, but she was not his boss. In early 2020, they began dating. She described appellant as "very honest and . . . fair." She continued, "He's very protective. He's just a very happy person, a good person to be around[,]" and hardworking.

In Christmas of 2020, she met Mother, Mother's husband, their daughter, C.V., and K.V. in Baytown. They stayed for about a week and mostly hung out at the house and watched television; at one point, the three girls and appellant took a walk to a park and returned with a "little Chihuahua." She believed appellant brought meals home everyday

25

as Mother was sick and Mother's husband was there for a "day or so." Smith described an event in which they "had a big bowl of popcorn and were throwing the popcorn . . . and everybody was trying to throw it in somebody's else's mouth."

She also described that on the first night of their arrival, they "went to bed and about [twenty] minutes later, the door flung open and [K.V. and C.V.] came racing into the bedroom and jumped right smack-dab in the middle of the bed." She said, "They were laughing and giggling." She described that they left, and then came back, "flung the door open once again, and they jumped in the bed." She believed C.V. and K.V. were happy to see appellant and she denied noticing anything that indicated the girls were scared of him. Smith denied seeing any physical affection between appellant and the girls. Smith also described an incident where appellant turned off the television when an inappropriate scene came on because "the girls decided to come in" the room.

During cross examination, Smith testified that she knew appellant had been arrested on October 11, 2021, and that he had been in custody ever since. She conceded she had known him a year or less, and she did not know him when the alleged events occurred. Smith agreed the girls were nice when she met them, and admitted that she does not have any sort of counseling degree, license in therapy, or training in human behavior.

**2.      S.H.**

Through an interpreter,[7] S.H. testified she is appellant and Mother's mother. She said she is not the biological grandmother of K.V. and C.V. but she "raised them" and

---

[7] The record also reflected that at times, the witness spoke in English.

would consider herself to be more like a parent to them. S.H. also testified that in January 2010, she, Mother, the girls, and the biological mother of C.V. and K.V. all went to Mexico, the biological mother stayed in Mexico, and she and Mother brought the girls back to Texas.

Further, S.H. testified that she believed her testimony will result in her being "out on the street" as she currently lives with Mother, her husband, and the girls. She discussed that towards the end of 2011, beginning of 2012, she was living with Mother, her husband, and the girls in Aransas Pass. From her recollection, appellant moved to Aransas Pass around 2014. At first, she could not recall whether he visited or was employed as a welder in 2012 during this time. She later recalled living with him for three to four months in Pleasanton in 2012 and him being employed as a welder.

Besides the three to four months she resided in Pleasanton with appellant, she lived in Aransas Pass with Mother, her husband, and the girls. She described the living arrangements as she and the girls in one room, and Mother and her husband in the other. Outside the trailer there was a "little room where [Mother's husband] did welding."

According to S.H., appellant was not living at the Aransas Pass property in 2012, but he would occasionally visit. She explained that when he visited, she would sleep on the floor with the girls. She traveled to Mexico in 2012 along with the girls, because her brother passed away, but appellant did not come along. S.H. testified that appellant was not living at the Aransas Pass property in 2013, but he would "come to visit." She described seeing him on weekends because "he would come in and pick up lunches." S.H. explained that she was "always there," in 2013, but then admitted she took a trip to Mexico that year. Appellant did not go on that trip and she believed the girls were left with

27

an aunt. In 2013, she described seeing appellant "every day" when he came to get lunch.

In 2014, appellant would come on "Saturdays and leave on Sundays" but she was "always there." She went on to state, "I would take care of those girls. I raised them. I've raised them. I was always with them because they were mischief [sic] little kids and I had to be right behind them at all times." She said appellant did not live at the Aransas Pass property in 2014. S.H. recalled appellant dressing up as Santa Claus for Christmas in 2014, and described the girls as happy during this time. In late 2014, she went to Monterrey, Mexico with appellant, but no one else went. In 2015, the living situation at the Aransas Pass property remained the same; appellant did not live there but he would visit, "every weekend." She described her trips to Mexico as infrequent.

When asked about the sexual abuse allegations, she stated, "Well, how did it happen? I was there with them at all time taking care of them and watching over them. How did that happen? I—I always saw that everything was fine and my son always respected them, so how did that happen?" She denied being away from home frequently and reiterated that she "was always with the girls." She testified that she "came to tell the truth, to tell everything that my eyes have seen."

During cross-examination, she agreed that in 2010 appellant was well over seventeen. Additionally, she testified that C.V. is "extremely dishonest. And [K.V.], they're joined by the hand together like this. Both dishonest." S.H. testified that she does not believe C.V.'s or K.V.'s allegations against appellant.

### 3.    Appellant

Appellant denied ever sexually abusing K.V. or C.V. He explained that in late 2011, S.H. requested he move to Aransas Pass from Washington for work and to be closer to

28

family. In 2012,[8] his job consisted of him working Monday through mid-day Saturday. He agreed he frequently went back to Aransas Pass on weekends during this time but said S.H. was always there.

During the weekends, he would mainly sleep because he was tired from the work week and would head back to the jobsite Sunday nights. He also denied ever being alone with K.V. or C.V. Before he finished his first job, he was offered another job in Cotula, Texas but before that job was complete he was needed back in Pearsall, Texas. Nevertheless, at the Cotula job, he would still go back for weekend visits.

When he returned to Pearsall, S.H. came to live with him for approximately three to four months. They would occasionally return to Aransas Pass to visit. During these times, he testified he was never alone with C.V. and K.V., and that S.H. was always there. He testified the job in Pearsall "maybe" concluded around the end of September 2013.

Before the job ended, he was offered another job in Crane, Texas, so his visits to Aransas Pass were less frequent and he bought a trailer from Mother and her husband. He agreed, that everytime he visited, "maybe once every two to three weeks" S.H. was there. Appellant estimated this job ended in early 2014. Appellant explained his next job was in Pampa, Texas, and he said he would "rarely" see family during his employment there. Appellant said S.H.'s testimony that he came back every weekend was "not really accurate," but he confirmed he came back as much as he could. The Pampa job he testified probably ended a "little bit after" 2014.

Appellant testified that he came back to visit Aransas Pass for Christmas 2014 and

_____

[8] The record shows the job site was either in Pearsall or Pleasanton.

29

dressed in a Santa suit. Towards the end of 2014, after Christmas, he took a trip to Monterrey, Mexico with S.H. In 2015, back in Texas he had another welding job lined up with a different company than Bay. For this project, he "stayed in the trailer with the family." He worked the "graveyard shift" from "3:30 [to] around 12:00" and would sleep in the first bedroom. S.H., he testified, was there every single day he was there. He also denied ever being alone with C.V. and K.V during this time. He testified that this job lasted about three to four months, and then he had another job lined up in George West, Texas. During his time in George West, he was living in a duplex by himself and visited the family on weekends more frequently. But again, he denied ever being alone with C.V. and K.V. and said S.H. was "always there." His next three-to-four month job that he confirmed was through the end of 2015 in Houston, Texas and he stayed in a hotel.

He further explained he was in Mexico at the end of 2016, and moved back to Washington in 2017 because he was laid off. He did not see his family for 2017, 2018, and 2019, and he did not talk to the girls on the phone, but he spoke with S.H. frequently.

In February of 2020, he met Smith, and he brought her to meet the family in Baytown towards the end of 2020. He described the girls as happy to see him, and described an event where he and Smith "went to bed, turned off the light to go to sleep and the girls come barging in and jump in the middle of the bed between both of us." After ushering C.V. and K.V. out of the room, they "came in and, again, the same thing, jump in the middle, you know, flipped on—they flipped on the lights and jumped in the middle. They're ha ha ha ha, just being loud, you know. Like I got to sleep." He recalled that he and Smith looked after the three girls for two to three days while Mother was sick. Appellant also confirmed that he found a picture of C.V. on his phone and he found out

30

"[a]fter [he] was in Mexico" that C.V. had taken.

He denied every sharing pornographic movies with his nieces. Also, appellant denied doing anything to C.V. or K.V. for them to accuse him of sexual abuse or touching them inappropriately. Appellant denied doing anything to Mother or her husband to cause her to coach the children.

## E.    Rebuttal

On rebuttal Mother conceded that the girls have lied in the past about doing their homework, doing laundry, cleaning the toilet, "minor things like that." But Mother denied that the girls have lied about anything more serious and denied that they had ever accused anyone of sexually abusing them or touching them in a private area apart from appellant. Mother denied that she or her husband ever told S.H. she would get kicked out of the house for her testimony, and she had no intentions of doing so.

Mother agreed that she saw appellant at her house and he stayed there more than fifty times when S.H. was not there. She denied that S.H. only went to Mexico for family funerals between 2010 and 2015. According to Mother, S.H. would travel to Mexico during that time period approximately two to three times a year and it would vary in lengths.

## F.    Verdict

Apart from an instruction that was included in the charge, appellant did not object to the charge. The jury found appellant guilty, and assessed punishment as set forth above. This appeal followed.

## II.    CHARGE ERROR

Appellant asserts he was egregiously harmed by unobjected-to errors in the jury charge. As detailed below, he alleges four separate errors, which we address in a different

order than he raised them, and two of which we construe together. We conclude there is no error as to one of his charge complaints, and he was not egregiously harmed as to the others.

## A.     Applicable Law and Standard of Review

The trial court has a duty to instruct the jury regarding the law applicable to the case. TEX. CODE CRIM. PROC. art. 36.14; *see Mendez v. State*, 545 S.W.3d 548, 551–52 (Tex. Crim. App. 2018); *see also* TEX. CODE CRIM. PROC. art. 36.13. Additionally, under Article 36.14, the trial court is required to give the jury a written charge "not expressing any opinion as to the weight of the evidence, not summing up the testimony, discussing the facts or using any argument in [its] charge calculated to arouse the sympathy or excite the passions of the jury." *Kirsch v. State*, 357 S.W.3d 645, 651 (Tex. Crim. App. 2012) (quoting TEX. CODE CRIM. PROC. art. 36.14). "As the instrument by which a jury is empowered to convict[], jury charges are meant to inform the jury of how to apply the applicable law to the facts of the case." *Alkayyali v. State*, 713 S.W.3d 780, 790 (Tex. Crim. App. 2025) (citation omitted). "[I]t must contain an accurate statement of the law and must set out all the essential elements of the offense." *Vasquez v. State*, 389 S.W.3d 361, 366 (Tex. Crim. App. 2012) (quotation omitted). "[I]t is the function of the charge to lead and to prevent confusion." *Murrieta v. State*, 578 S.W.3d 552, 554 (Tex. App.—Texarkana 2019, no pet.) (citation omitted).

A jury charge contains both an abstract section and application section. *Crenshaw v. State*, 378 S.W.3d 460, 466 (Tex. Crim. App. 2012). "Abstract paragraphs 'serve as a glossary to help the jury understand the meaning of concepts and terms used in the application paragraphs of the charge,' and application paragraphs apply the 'pertinent

32

penal law, abstract definitions, and general legal principles to the particular facts and the indictment allegations.'" *Alcoser v. State*, 663 S.W.3d 160, 165 (Tex. Crim. App. 2022) (quoting *Crenshaw*, 378 S.W.3d at 466).

"As a general matter, definitions for terms that are not statutorily defined are not considered to be 'applicable law' under Article 36.14, and it is thus generally impermissible for the trial court to define those terms in the jury instructions." *Green v. State*, 476 S.W.3d 440, 445 (Tex. Crim. App. 2015) (citations omitted). "A nonstatutory instruction, even if facially neutral and legally accurate, may nevertheless consititute an improper comment on the weight of the evidence." *Poor v. State*, 715 S.W.3d 15, 33 (Tex. App.—Eastland 2024, pet. ref'd) (op. on reh'g) (citations omitted). "Consistent with the terms of Article 36.14, we have explained that jurors should be permitted to 'freely read [undefined] statutory language to have any meaning which is acceptable in common parlance.'" *Green*, 476 S.W.3d at 445 (quoting *Kirsch*, 357 S.W.3d at 650) (alteration in original). Although it is generally impermissible to instruct on the meaning of terms that are not statutorily defined, an exception to that general rule exists for "terms which have a known and established legal meaning, or which have acquired a peculiar and appropriate meaning in the law, as where the words used have a well-known common law meaning." *Kirsch*, 357 S.W.3d at 650.

"In examining the charge for possible error, reviewing courts 'must examine the charge as a whole instead of a series of isolated and unrelated statements.'" *Vasquez*, 389 S.W.3d at 366 (citation modified). If there is an alleged jury-charge error, we must engage in a two-step analysis. *Hart v. State*, 721 S.W.3d 667, 673 (Tex. App.—Corpus Christi–Edinburg 2025, pet ref'd). First, we must decide whether error exists. *Ngo v. State*,

33

175 S.W.3d 738, 743 (Tex. Crim. App. 2005) (citation omitted). If so, we must decide whether the appellant was harmed by the erroneous charge. *Alcoser*, 663 S.W.3d at 165 (citations omitted). "Harm is assessed 'in light of the entire jury charge, the state of the evidence, including contested issues and weight of [the] probative evidence, the argument of counsel and any other relevant information revealed by the record of the trial as a whole.'" *Id.* (citation modified).

When, as here, the appellant does not make a timely objection during the proceedings below, we must determine whether the record establishes that the error caused him "egregious harm." *Gonzalez v. State*, 610 S.W.3d 22, 27 (Tex. Crim. App. 2020) (citation omitted). "An erroneous jury charge is egregiously harmful if it affects the very basis of the case, deprives the accused of a valuable right, or vitally affects a defensive theory." *Alkayyali*, 713 S.W.3d at 789 (quoting *Alcoser*, 663 S.W.3d at 165)). Egregious harm is a difficult standard to satisfy, and the analysis is fact-specific. *Poor*, 715 S.W.3d at 34 (citation omitted). The harm must be actual, as opposed to merely theoretical. *Gonzalez*, 610 S.W.3d at 27. "[A]ll alleged jury-charge error must be considered on appellate review regardless of preservation in the trial court." *Kirsch*, 357 S.W.3d at 649.

## B. No Error

Because we conclude appellant's last jury charge complaint, as described below in more detail, was not erroneous, we address it first and do not reach the question of harm. *See* TEX. R. APP. P. 47.1. Specifically, appellant argues that the charge permitted the jury to find him guilty so long as two or more predicate acts occurred during a period of thirty days or more in duration regardless of whether the acts occurred at least thirty

34

days apart. After directing us to a split among appellate courts on this issue, he acknowledges that our Court has already weighed in on this issue in *Perez v. State*, 689 S.W.3d 369 (Tex. App.—Corpus Christi–Edinburg 2024, no pet.). But appellant urges us to consider the concurrence's conclusion that the charge contained error because the application paragraph here is "slightly different" than that in *Perez*. *See id*. at 383–85 (Contreras, C.J.concurring) ("The majority concludes, in part, that the jury charge in this case pertaining to the offense of continuous sexual abuse of a young child was not erroneous because it directly tracked the language in penal code [section] 21.02. I respectfully disagree. I would conclude that the charge contained error, but because the error was harmless, I concur in the Court's judgment affirming the convictions."). The slight difference, appellant posits, is that the instruction at issue here eliminated the "specific on-or-about dates from the indictment to the application paragraph, instead including language 'on or about a date prior to the presentment of the indictment.'" In relevant part, the State counters that no error exists and implicitly urges us to follow the majority opinion in *Perez*.

As in *Perez*, the instructions here included in pertinent part:

A person commits the offense of Continuous Sexual Abuse if:

(1)     during a period that

(2)     Is 30 or more days in duration, the person commits two or more acts of sexual abuse, regardless of whether the acts of sexual abuse are committed against one or more victims; and

(3)     at the time of the commission of each of the acts of sexual abuse, the actor is 17 years of age or older and the victim is a child younger than 14 years of age.

. . . .

35

You are further instructed, in order to find the defendant guilty of the offense of continuous sexual abuse of a child younger than fourteen (14) years of age, you are not required to agree unanimously on which specific acts of sexual abuse were committed by the defendant or the exact date when those acts were committed. However, in order to find the defendant guilty of the offense of continuous sexual abuse of a child younger than fourteen (14) years of age, you must agree unanimously that the defendant, during a period that is 30 or more days in duration, on or about a date prior to the presentment of the indictment, committed two or more acts of sexual abuse against children younger than fourteen (14) years of age.

In *Perez*, the application paragraph read:

Now if you find from the evidence beyond a reasonable doubt that the Defendant, ORLANDO REYES PEREZ, did then and there, in Hidalgo County, Texas, **during a period that was 30 or more days in duration, to-wit: from on or about the 15th day of September, 2017, to on or about the 1st day of December, 2018**, when the defendant was 17 years of age or older, committed two or more acts of sexual abuse against MARIA GARCIA, a pseudonym, a child younger than 14 years of age, namely aggravated sexual assault of a child and indecency with a child, then you will find the Defendant guilty of the offense of Continuous Sexual Abuse of a Child as charged in this indictment.

*Id*. at 380 (emphasis added).

On the other hand, the application paragraph in appellant's charge read:

Now bearing in mind the foregoing instructions, if you believe from the evidence beyond a reasonable doubt that the defendant, SERGIO ADRIAN CONTRERAS **on or about a date prior to the presentment of the indictment**, in San Patricio County, Texas, **during a period that was 30 days or more in duration**, did intentionally or knowingly commit two or more acts of sexual abuse against the children, [K.V.] and [C.V.], said acts of sexual abuse having been violations of one or more of the following penal laws, namely:

1.      aggravated sexual assault, namely, caused the penetration of the sexual organ of [K.V.] by the defendant's finger;

2.      indecency with a child, namely by touching the genitals of [K.V.].

3.      aggravated sexual assault, namely, caused the penetration of the mouth of [C.V.], by the defendant's sexual organ;

36

and at time of the commission of each of the acts of sexual abuse, the defendant was 17 years of age or older and [K.V.] and [C.V.], were children younger than 14 years of age, then you will find the defendant guilty of the offense of Continuous Sexual Abuse of a Child, as alleged in the indictment, and so say by your verdict in Verdict Form 1. . . .

(emphasis added).

Although the application paragraph did not list the "on-or-about dates" that were included in the indictment this language still required a finding that, during a period of thirty days or more in duration, appellant committed two or more acts of sexual abuse, prior to the presentment of the indictment, and thus, like in *Perez*, the charge reflects the language and structure of the offense as provided by the Texas Penal Code. *See id.*; TEX. PENAL CODE § 21.02(b) ("A person commits an offense if: (1) during a period that is 30 or more days in duration, the person commits two or more acts of sexual abuse, regardless of whether the acts of sexual abuse are committed against one or more victims; and (2) at the time of the commission of each of the acts of sexual abuse, the actor is 17 years of age or older and the victim is . . . a child younger than 14 years of age, regardless of whether the actor knows the age of the victim at the time of the offense . . . .").

As such, and applying the principles of horizontal stare decisis, *see Mitschke v. Borromeo*, 645 S.W.3d 251, 257 (Tex. 2022), we follow the majority in *Perez* and we decline to find error here. *See Perez*, 689 S.W.3d at 380; *see also Martinez v. State*, 924 S.W.2d 693, 699 (Tex. Crim. App. 1996) ("Following the law as it is set out by the Texas Legislature will not be deemed error on the part of the trial judge."); *Gonzalez v. State*, No. 13-23-00119-CR, 2025 WL 2355619, at *4 (Tex. App.—Corpus Christi–Edinburg Aug. 14, 2025, pet. ref'd) (mem. op., not designated for publication) (overruling appellant's

37

second challenge that "the jury charge caused the jury to convict him of Count 1 'regardless of the thirty[-]day element,'" after reasoning that the Court is bound by the principle of horizontal stare decisis to follow precedent holding otherwise); *Ortiz v. State*, No. 13-23-00082-CR, 2024 WL 2066821, at *3 (Tex. App.—Corpus Christi–Edinburg May 9, 2024, pet. ref'd) (mem. op., not designated for publication) ("We are bound by the principle of horizontal *stare decisis* to once again conclude that the statutory language in this jury charge was sufficient to inform the jury about the contours of the duration element." (citation omitted)). Since we conclude that the jury charge was not erroneous, we do not reach the question of harm. *See* TEX. R. APP. P. 47.1.

## C.    No Egregious Harm

Because we assume without deciding, *see State v. Sciacca,* 518 S.W.3d 460, 464–65 (Tex. App.—Houston [1st Dist.] 2016, no pet.), that error exists in the charge as to appellant's three other complaints, we proceed to determine whether he was egregiously harmed. *See Alcoser*, 663 S.W.3d at 165; *Green*, 476 S.W.3d at 446–51. An analysis for egregious harm considers: (1) the entire jury charge; (2) the state of the evidence; (3) the final arguments of the parties; and (4) any other relevant information revealed by the trial court as a whole. *Reed v. State*, 680 S.W.3d 620, 626 (Tex. Crim. App. 2023).

### 1.    Omission of Culpable Mental State for Predicate Offenses

Appellant first appears to argue that the culpable mental state for the predicate offenses were expressly omitted from the pertinent application portion of the charge and that they were not incorporated by reference from the abstract portion of the charge. *See* TEX. R. APP. P. 38.9 (providing the briefing rules should be construed liberally). These alleged errors, appellant contends, denied his right to have a jury to determine key

38

elements of the offense of continuous sexual abuse of a child, and allowed the jury to convict on less than proof beyond a reasonable doubt in violation of his due process rights under the Fifth and Fourteenth Amendments to the United States Constitution, as well as his right to due course of law under article 1, section 19 of the Texas Constitution. Second, appellant argues that the definition of "sexual contact" provided in the charge failed to properly inform the jury of the intent requirement. Additionally, he argues the jury cannot look to the application paragraph for the lesser included offense of indecency with a child to cure the mistake either, he argues, because the charge improperly included "intentionally or knowingly" with the specific intent necessary to complete the indecency offense.

In light of the State's response to appellant's first argument, that implicitly concedes error by principally arguing that appellant was not egregiously harmed and its response to his second argument that "the jury charge factually states the law (while in a different order than the statute)," we will assume without deciding that error exists and proceed to determine whether appellant was egregiously harmed.

Even if we were to credit the first factor, the charge as a whole, as weighing towards egregious harm, we nevertheless conclude that the remaining three factors weigh against it. Arguments of counsel centered around, from appellant's viewpoint, K.V.'s and C.V.'s inconsistencies and "lies," while from the State's viewpoint, K.V. and C.V. made clear disclosures with some facts understandably forgotten given their age and endured trauma. *See e.g.*, *Green*, 476 S.W.3d at 450 ("Because defense counsel's arguments and theory focused on establishing that the complainant fabricated the entire sexual incident, we conclude that the record fails to reveal that appellant's defensive

39

strategy was affected by the erroneous definitions."). Appellant's intent was never a contested issue at trial. *See Love v. State*, 706 S.W.3d 584, 606 (Tex. App.—Austin 2024, pet. ref'd) (deciding no egregious harm existed, from error in the charge by tailoring the culpable mental state definitions to a result-of-conduct offense, after reasoning in part that "[appellant's] intent or knowledge was not a contested issue at trial"); *Saldivar v. State*, 783 S.W.2d 265, 268 (Tex. App.—Corpus Christi–Edinburg 1989, no pet.) ("Where no defense is presented which would directly affect an assessment of mental culpability, there is no harm in submitting erroneous definitions of 'intentionally' and 'knowingly.'"). Rather, appellant advanced defensive theories that K.V.'s and C.V.'s allegations against him were entirely false; he lacked the opportunity to sexually abuse them because he did not live at the location where the abuse was said to have occurred, and even if he occasionally visited that location, S.H. was "always there" so he was never alone with them; and the investigation by Captain Poe was wholly insufficient or non-existent. Because appellant's defensive theories did not focus on his mental state, the claimed error did not cause him egregious harm.

2.    **Charge Language**

Next, principally relying on *Green*, 476 S.W.3d at 440 appellant also argues the jury instructions are erroneous because the trial court improperly commented on the weight of the evidence by defining "penetration" and "female sexual organ" as follows:

> "Female sexual organ" means and includes the vulva or tissue immediately surrounding the vagina and the vagina and female genitalia or any parts between the labia of the female genitalia."

> Touching beneath the folds of the external genitalia amounts to penetration.

> You are instructed that "penetration" is complete however slight.

40

The State counters that no error exists as to "penetration," as it is an instruction and not a definition. Additionally, the State responds that "*Green* used definitions that were a little more detailed than the language used in the present case and that appellant cannot show egregious harm. As referenced above, we will assume without deciding that error exists, and proceed to determine whether appellant was egregiously harmed.

In considering the charge as a whole, *see Green*, 476 S.W.3d at 446, we observe that "female sexual organ" as included in this charge was less detailed than in *Green*. *See id*. at 444 (defining the term "'female sexual organ,' as meaning "the entire female genitalia, including both vagina and the vulva," and the instructions specified that "'[v]ulva' is defined as the external parts of the female sexual organs, including the labia majora, the labia minora, mons veneris, clitoris, perineum, and the vestibule or entrance to the vagina"); *see also Duarte v. State*, No. 13-16-00198-CR, 2017 WL 5184836, at *7–8 (Tex. App.—Corpus Christi–Edinburg Nov. 9, 2017, no pet.) (mem. op., not designated for publication). The same can also be said as to "penetration" here (i.e., "You are instructed that 'penetration' is complete however slight.") as opposed to that in *Green*. *See id*. at 444 (explaining that the "trial court defined the word 'penetration,' as something that 'occurs so long as contact with the female sexual organ could reasonably be regarded by ordinary English speakers as more intrusive than contact with the outer vaginal lips and is complete, however slight, if any.'"). As well as for "[t]ouching beneath the folds of the external genitalia amounts to penetration" as opposed to the detail in *Green*. *See id*. at 447 (specifiying that "[t]ouching beneath the fold of the external genitalia amounts to penetration within the meaning of the aggravated sexual assault statute").

Additionally, here, the trial court included the following instructions in the jury

41

charge:

> Nothing the judge has said or done in this case should be considered by you as an opinion about the facts of this case or influence you to vote one way or the other.

In light of the foregoing, we find this factor weighs against egregious harm. Additionally, while the State did elicit testimony from Dr. Donaruma regarding "penetration" and mentioned it in closing argument, the State did not belabor the point. And again, the central dispute surrounded K.V.'s and C.V.'s credibility, a supposed lack of opportunity for appellant to sexually abuse them, and a proclaimed non-existent investigation, not a factual dispute as to the type or degree of alleged touching or penetration by appellant. *See id.* at 451; *Turner v. State*, 626 S.W.3d 88, 99 (Tex. App.—Dallas 2021, no pet.) (concluding that no error existed but explaining in the context of assuming error that, "The fundamental issue as to the allegations against appellant centered around credibility of the witnesses—not the degree of the alleged touching"). Thus, we conclude appellant was not egregiously harmed, and we overrule appellant's first issue.

### III.    SUFFICIENCY

Appellant argues by his second issue that the evidence was legally insufficient to prove that he committed continuous sexual abuse of a child because there is not enough evidence for the jury to determine that two acts of sexual abuse occurred more than thirty days apart. We disagree.

### A.    Standard of Review and Applicable Law

To satisfy constitutional due process requirements, a criminal conviction must be supported by sufficient evidence. *Laster v. State*, 275 S.W.3d 512, 517 (Tex. Crim. App.

42

2009). "Evidence supporting a conviction is legally sufficient if a rational trier of fact could have found each element of the offense beyond a reasonable doubt." *David v. State*, 663 S.W.3d 673, 678 (Tex. Crim. App. 2022) (citing *Jackson v. Virginia*, 443 U.S. 307, 318 (1979)). In a legal sufficiency review, "we consider all the evidence in the light most favorable to the verdict and determine whether, based on that evidence and reasonable inferences therefrom, a rational juror could have found the essential elements of the crime beyond a reasonable doubt." *Hammack v. State*, 622 S.W.3d 910, 914 (Tex. Crim. App. 2021).

We defer to the jury's role as the factfinder, which includes "resolving conflicts in the testimony, weighing the evidence, and drawing reasonable inferences from basic facts." *Murray v. State*, 457 S.W.3d 446, 448 (Tex. Crim. App. 2015). "[A]n inference is a conclusion reached by considering other facts and deducing a logical consequence from them." *Anderson v. State*, 416 S.W.3d 884, 888 (Tex. Crim. App. 2013) (quoting *Hooper v. State*, 214 S.W.3d 9, 16 (Tex. Crim. App. 2007)). We consider "whether the necessary inferences are reasonable based upon the combined and cumulative force of all the evidence when viewed in the light most favorable to the verdict." *Murray*, 457 S.W.3d at 448 (quoting *Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007)).

"We measure the sufficiency of the evidence against the hypothetically correct jury charge." *Garcia v. State*, 667 S.W.3d 756, 762 (Tex. Crim. App. 2023). "A hypothetically correct jury charge 'accurately sets out the law, is authorized by the indictment, does not unnecessarily increase the State's burden of proof or unnecessarily restrict the State's theories of liability, and adequately describes the particular offense for which the defendant was tried.'' *Curlee v. State,* 620 S.W.3d 767, 778 (Tex. Crim. App. 2021)

43

(quoting *Malik v. State*, 953 S.W.2d 234, 240 (Tex. Crim. App. 1997)).

A person commits the offense of continuous sexual abuse of a child if, "during a period that is 30 or more days in duration, the person commits two or more acts of sexual abuse" against a child younger than fourteen years of age "regardless of whether the acts of sexual abuse are committed against one or more victims." TEX. PENAL CODE § 21.02(b). As relevant here, "acts of sexual abuse" include aggravated sexual assault and indecency with a child. *See id*. §§ 21.02(c)(2), (c)(4). "[M]embers of the jury are not required to agree unanimously on which specific acts of sexual abuse were committed by the defendant or the exact date when those acts were committed." *Id*. § 21.02(d). "But, the proof must establish 'there is at least 28 days between the day of the first act of sexual abuse and the day of the last act of sexual abuse.'" *Perez*, 689 S.W.3d at 378 (quotation omitted). And "[i]t is a longstanding rule that the State is not required to prove that an offense was committed on the date alleged in the indictment . . . but may prove that the offense was committed on any date prior to the return of the indictment and within the period of limitations." *Martin v. State*, 335 S.W.3d 867, 873 (Tex. App.—Austin 2011, pet. ref'd) (citation omitted). "Child victims of sexual crimes are afforded great latitude when testifying and they are not expected to testify with the same clarity and ability as is expected of a mature and capable adult." *Hiatt v. State*, 319 S.W.3d 115, 121 (Tex. App.— San Antonio 2010, pet. ref'd) (citation omitted).

B.    Analysis

Appellant only challenges the element that the sexual abuse occurred over a period of thirty days or more. Even assuming C.V.'s testimony that the abuse spanned a period of "more than weeks" is alone insufficient, as appellant posits, we can otherwise

44

deduce from the record, as discussed below, that there is sufficient evidence that appellant during a period of thirty or more days in duration committed two or more acts of sexual abuse against C.V. and K.V.

To begin, Mother testified that C.V.'s birthdate is May 27, 2007, and K.V.'s birthdate is April 6, 2008. C.V. answered, "[y]es" that appellant had her suck on his penis (i.e., committed aggravated sexual assault, *see* TEX. PENAL CODE § 22.021(a)(1)(B)(ii)) more than one time, and stated this occured when she was "[m]aybe seven or six." Six years from C.V.'s birthdate would have been May 27, 2013, and seven years would have been May 27, 2014.

C.V.'s medical records reflected that C.V. indicated the abuse stopped, "When we moved - like, 4 years ago." *See Meza v. State*, 706 S.W.3d 914, 921 (Tex. App.—Dallas 2024, pet. ref'd) ("The Texas Court of Criminal Appeals has for decades recognized that child victims cannot be expected to testify with the same clarity and ability that is expected of mature and capable adults." (citation omitted)); *see also Jimenez v. State*, No. 13-23-00333-CR, 2024 WL 3963959, at *6 (Tex. App.—Corpus Christi–Edinburg Aug. 28, 2024, pet. ref'd) (mem. op., not designated for publication) (concluding that the evidence, taken as a whole, reasonably supports a finding that at least thirty days elapsed between the first and last acts of abuse upon reasoning in part that "the evidence before the jury included [the pediatrician's] report, which [the pediatrician] said indicated that the abuse occurred until [the complainant,] was in sixth grade."). Additionally, Mother testified that she moved out of Aransas Pass in 2016 with the girls and moved to Louisiana. Appellant admitted that he was at the property where the abuse was alleged to have occurred, albeit to "visit," from 2012 through 2015, and while he and S.H. disputed that he was ever alone

45

with K.V. and C.V. during this timeframe, the jury clearly rejected this testimony. *See Murray*, 457 S.W.3d at 448; *see also Perdomo-Mejia v. State*, No. 13-24-00079-CR, 2026 WL 62594, at *4 (Tex. App.—Corpus Christi–Edinburg Jan. 8, 2026, no pet.) (mem. op. not designated for publication) ("As the fact finder, the jury was responsible to fairly resolve conflicts in testimony, weigh the evidence, and draw reasonable inferences." (citation omitted)). For the same reason, the jury did not have to rely on Dr. Donaruma's testimony as to when the abuse stopped, i.e., "[r]oughly 2017," as they heard from Mother, that she, along with the girls, moved away from Aransas Pass in 2016. Finally, the jury could have credited Mother's testimony that C.V. stated the sexual abuse "happened a lot of times" for purposes of determining the duration of the sexual abuse.

Although K.V. testified that she remembered that the incident in which he "licked his fingers and put them in [her] private" (i.e., committed aggravated sexual assault, *see* TEX. PENAL CODE § 22.021(a)(1)(B)(i)) happened "once," Dr. Donaruma testified to facts from which a rational jury could have inferred that appellant committed two or more acts of sexual abuse against her namely, "that [h]e would touch her with his hand and his hand would grab her front part. I clarified that the front part is where the period comes from and she said, yes, that was right[,] and that she thought it started when she was "seven" and it stopped when "he moved out or he traveled." *See Meza*, 706 S.W.3d at 921. Seven years from K.V.'s birthdate would have been April 6, 2015, and the jury could have reasonably inferred that "[appellant] moved out" in 2016 when K.V. and C.V. moved out because their departure would have ended his "visits" to a place he insisted he did not live. And again, though Dr. Donaruma agreed that "K.V. is basically saying that this all happened started and stopped, when she was seven years old," the jury could have

46

rejected this testimony and instead relied on Mother's testimony that they moved in 2016 and in turn taken 2016 as the date the abuse ended.

The record contains sufficient evidence that appellant sexually abused C.V. and K.V. more than once during a period that is "thirty days or more," and that there were at least twenty-eight days between the day of the first act of sexual abuse and the day of the last act of sexual abuse. *See* TEX. PENAL CODE § 21.02(b); *Perez*, 689 S.W.3d at 378. We overrule appellant's second issue.

## IV.    VOIR DIRE

By his third issue, appellant next argues that the trial court improperly prohibited his counsel from questioning jurors who had identified themselves as victims of sexual assault or close family members or friends of a victim of sexual assault. Additionally, appellant complains this alleged limitation prohibited him from further questioning of veniremembers 14, 32, and 36, which hindered his ability to use proper challenges.[9]

### A.    Pertinent Facts

During voir dire the following exchange occurred:

| | |
|---|---|
| [State]: | All right. Now, is there anyone here that has ever been, just raise your hands, a victim of sexual abuse either themselves, wait, wait, wait, I'm going to ask it general so I'm not—either themselves, a very close family member or a very close friend? |
| | (Show of cards.) |
| | Okay, keep your hands. I'm going to call them out because I always get tons. Number 2, 8, I'm sorry, 12, 14. No one else? Okay, 21, 22. Yeah, you can put your cards down as we talk. Anyone |

---

[9] We note that appellant does not challenge the trial court's denial of his challenges for cause to veniremembers 14, 32, and 36.

| | |
|---|---|
| | else over here? Okay, 31, 32, 34, 36, 47, 41, 43, 52, 53, 62, 69, 55, I'm sorry ma'am, 64. |
| Prospective Juror: | Forgot mine. |
| [State]: | Forty. Okay, thank you. If I missed you, yes, please holler out. Seventy-five, 73, thank you, 81, 82, 80, 89, 91, 92, 83, 84, 85. Okay, 99 I got you, I think. Okay, 99, 100, 103, 105, 106, 108. Did I miss anyone? |
| | *Okay. Now, out of those of you that raised your hand right now that either you, yourself, a close family member or a close friend have been a victim of sexual abuse, okay, how many of you feel that based on that circumstance you just cannot sit in this case and make a decision based on the evidence and the law in this case?* I need you to raise your hands, please. |
| | Okay. Number 2, 8, 41, 43, 52, 62, 73, 82, 85, 99, 100, and 108. Thank you. Thank you. And for those of you that have had that experience, I am sorry. I know it is difficult. I actually see some people tearing up. I'm sorry. I know this brings up emotional feelings and we're gonna . . . get through this as fast as we can, okay? |
| | . . . . |
| [Appellant's counsel]: | [T]he allegations in this case, they're not fun to talk about, they're not easy to talk about. They involve child complaints. But, again one of the— the most important thing that we need from you is honesty and truthfulness. [The State] asked some of you folks earlier about either a personal involvement, family or friend involvement, in sexual assault cases. Now, I don't want to press you on that, but what she did not do, what—she explained that there was no excuse, the Judge explained that there was no excuse for not sitting on the case unless those feelings, those involvements with sexual assaults previously would cause you to not be able to be an impartial witness in this case. Now, a number of |

you folks held up your numbers when we went over many of you being either personally or knowing somebody, friends, or family member, that were involved or a victim of sexual assault. Number 2, Number 8, Number 41, Number 43, Number 52, Number 62, Number 73, Number 82, Number 99, Number 100 and Number 108. *This question is for you-all. Does your personal involvement or the involvement of your friend or family member in being a victim of a sexual assault case, would that cause you to be a biased juror or be impartial?* And again, we are here for honesty, folks. This is the time. If any of you whose numbers I just mentioned would be unable to sit as an impartial juror on this case because of that, please, raise your numbers.

Number 2, you would be unable to be an impartial juror because of that?

Prospective Juror 2: That's right.

[Appellant's counsel]: Thank you.

The Court: Counsel, just a second.

(Bench conference as follows:)

The Court: By my notes, all those numbers that you called out are—have answered that already. You don't need to go any further.

[State]: Yeah.

[Appellant's counsel]: I believe she expressed that she didn't get into (inaudible, whispering). All she did was lay it out and they didn't say anything—

The Court: No, I understood those to be based on answers from folks that will be struck for cause.

[State]: Right.

The Court: Go ahead.

49

(Bench conference concluded.)

[Appellant's counsel]: We're going to move on, folks. Many of you answered the question earlier that you have children, maybe nieces and nephews. How many of you believe that children lie?

. . . .

The Court: . . . Challenge [to venireperson] 14?

[Appellant's counsel]: Yes.

The Court: What is your challenge?

[Appellant's cousenl]: Impartiality based on being a previous victim of assault or friend or family member of assault, exactly what I approached the [b]ench on when I was trying to ask these questions. Was instructed by the Court not to follow up, that they had already been decided as struck for cause.

The Court: That was not one of those that raised their card saying that they were not able to be fair, as I— that's my notes at least.

[State]: I agree with the Court.

[State co-counsel]: That's—I agree with the Court.

[Appellant's counsel]: I'd like to challenge for cause and I'd like to try and take them separately for that, Judge.

The Court: Overrule your challenge. Challenge 15?

You specifically called out a number of folks that had raised their cards before. Fourteen was not one of those that you called.

[State]: Nothing from the State.

[Appellant's counsel]: Judge, you told me to move on with my questioning.

50

| | |
|---|---|
| The Court: | You were questioning everyone that raised their cards. |
| [Appellant's counsel]: | Correct. |
| The Court: | That was not one that raised their card. |
| [Appellant's counsel]: | I had it written down that it was. |
| The Court: | That's not what my records show. Challenge 15? |
| [Appellant's counsel]: | Okay. Again, on the record on that, disagree. |
| | . . . |
| The Court: | Challenge 32? |
| [Appellant's counsel]: | Yes. |
| The Court: | What is your challenge on 32? |
| [Appellant's counsel]: | Same answer; they felt that they could not be impartial for either personally being a victim of a sexual assault or having a friend or family member a victim of sexual assault. |
| The Court: | That's not what they said. |
| [State]: | That's not— |
| The Court: | They did not raise their card to that question. Overrule the challenge. |
| [Appellant's counsel]: | Judge, again, I'd like to put it on the record that I tried to flush this out with all of these folks that I had written down. This is why I was going through this with— |
| The Court: | It will be on the record that you asked those folks that you wanted to question to raise their cards. Number 15—I'm sorry—Number 14 did not raise their card, did not indicate that she could not be fair. Number 32 did not raise her card to indicate that she could not be fair. Those folks |

51

|                         |                                                                                                                                                                  |
|-------------------------|------------------------------------------------------------------------------------------------------------------------------------------------------------------|
|                         | were the folks that you sought to question about being fair.                                                                                                      |
| [Appellant's counsel]:  | My Co-Counsel also has 32 written down, Judge. I mean—                                                                                                            |
| The Court:              | Yeah, she indicated that she or someone she knows was the victim of a crime. You indicated that you wanted to make sure that you could visit with those folks that indicated they could not be fair. I had already made those determinations. Everyone that indicated that they could not be fair was already asked about that. |
| [Appellant's counsel]:  | Judge, you shut down my questioning on that.                                                                                                                      |
| The Court:              | You wanted—You wanted all of those folks that indicated they could not be fair, that's who you wanted to raise their cards, once again, and you started to go through those and I advised you that all of those folks that had their cards raised to your question were already going to be struck for cause. That did not include Number 14. That did not include Number 32. |
|                         | . . . .                                                                                                                                                          |
| The Court:              | . . . Challenge 36?                                                                                                                                               |
| [Appellant's counsel]:  | Yes.                                                                                                                                                              |
| [State]:                | I don't have 36.                                                                                                                                                  |
|                         | . . . .                                                                                                                                                          |
| The Court:              | Thirty-six indicated that she or someone she knew was a victim of a sexual offense. She did not raise her card to your question, your follow-up question, [Appellant's Counsel]. Overrule that challenge, if that's your challenge. |
| [Appellant's counsel]:  | Judge, I want to make it very clear. I was trying to go through these folks one by one and I was shut down by this Court.                                          |

52

| | |
|---|---|
| The Court: | I want to make it very clear that you had everyone that you wanted to have that question posed to raise their cards. Ever—And you called them out. |
| [Appellant's counsel]: | Not— |
| The Court: | Every person whose number you called out had already been determined by me to be struck for cause. Those were the folks that you did not need to further question. |
| [Appellant's counsel]: | That line of questioning was shut down by this Court, Your Honor. |
| The Court: | I've responded. I've ruled. Thank you very much. |

(Emphasis added).

## B.    Standard of Review and Applicable Law

The trial court has broad discretion over the process of selecting a jury. *Fuller v. State*, 363 S.W.3d 583, 585 (Tex. Crim. App. 2012). We leave to the trial court's discretion the propriety of a particular question and will not disturb the trial court's decision absent an abuse of discretion. *Id*. A question is proper if it seeks to discover a juror's views on an issue applicable to the case. *Id*. "While the right of the accused to question a veniremember freely and broadly is a right that should never be unnecessarily limited or restricted, trial courts may impose reasonable restrictions on the exercise of voir dire examination." *Chakravarthy v. State*, 516 S.W.3d 116, 128 (Tex. App.—Corpus Christi–Edinburg 2017, pet. ref'd) (citation omitted). A trial court may limit voir dire questions that are duplicative or repetitious. *See Hernandez-Faced v. State*, 661 S.W.3d 630, 636 (Tex. App.—Houston [14th Dist.] 2023, pet. ref'd) (citation omitted).

## C.    Analysis

Here, the trial court did not improperly prohibit appellant from questioning venirepersons who had identified themselves as victims of sexual assault or close family members or friends of a victim of sexual assault. Instead, the trial court prohibited appellant's counsel from asking venirepersons 2, 8, 41, 43, 52, 62, 73, 82, 99, 100 and 108 if their "personal involvement or the involvement of your friend or family member in being a victim of a sexual assault case, would . . . cause you to be a biased juror or be impartial?" But this limitation by the trial court was reasonable because that question, albeit phrased slightly differently, had already been asked by the State, and answered.[10] *See Chakravarthy*, 516 S.W.3d at 130 (holding trial court did not abuse its discretion when it denied appellant's request to ask certain questions, reasoning in part that "[m]ost of the questions had been asked previously by the trial court or the State, and the trial court determined them to be unnecessarily repetitious"); *Hernandez-Faced*, 661 S.W.3d at 636 (concluding trial court acted with its discretion in limiting appellant's voir dire reasoning in part that "the potential jurors' attitudes toward the State's burden of proof had been adequately explored through previous voir dire questions and the scaled question was unnecessarily repetitive as a result").

When the trial court limited appellant's counsel from further questioning of venirepersons 14, it was in the context of his challenge for cause based on impartiality which was unsupported, as the trial court tried to explain and the record shows, this venireperson did not indicate that she could not "sit in this case and make a decision based on the evidence and the law in this case." That is, they did not indicate they could

_____

[10] We note that we have added the underline for ease of referencing the questions.

not be impartial. Appellant did not ask to question venirepersons 32 and 36 further. Thus, we conclude that the trial court did not abuse its discretion by limiting appellant's questioning and there was no abuse of discretion regarding his use of his peremptory challenges and challenges for cause. In concluding as such, we do not conduct a harm analysis, *see Easley v. State*, 424 S.W.3d 535, 542–43 (Tex. Crim. App. 2014), and overrule his third issue.

## V. PROSECUTORIAL MISCONDUCT

Finally, appellant argues that the State engaged in prosecutorial misconduct during the course of the trial and in closing argument that impeded his right to a fair trial. His first complaint is premised on objected-to testimony from Dr. Donaruma. He further argues that, even if his objection failed to preserve error, the elicited testimony together with unobjected-to portions of the State's closing arguments amounted to "fundamental error." His second complaint is premised on unobjected-to portions of the State's closing argument during the guilt-innocence phase of trial that he also argues amounted to fundamental error.

## A. Testimony and Argument

The testimony of Dr. Donaruma which underlies appellant's first misconduct complaint is as follows:

| [State]: | And what sort—would you consider it, we're in trial here, would you consider it a very difficult task for a child, a teenager, to discuss sexual abuse in trial? |
|---|---|
| [Dr. Donaruma]: | I can't imagine the courage it takes to get up here as a survivor and tell a whole roomful of people what happened to me. Yes, I think that would be incredibly, incredibly difficult. |

55

| | |
|---|---|
| [State]: | Add to that, if you've not really had any real therapy, how does that go? |
| [Dr. Donaruma]: | I don't think as well as it could. |
| [State]: | Add to that, an attorney questioning them every minute detail, a defense attorney. |
| [Dr. Donaruma]: | It is common to read articles called, The Re-victimization by the Justice System, for elements like that. |
| [State]: | Can you say that louder because I had a hard time hearing that I think it's an important point? |
| [Dr. Donaruma]: | It is common to hear the phrase Re-victimization by the Justice System in conversations about child abuse survivors going through the process of—of a trial. |
| [State]: | Because, in fact, they are re-victimized in the courtroom, aren't they, many times? |
| [Appellant's Counsel]: | Objection, Your Honor. |
| The Court: | What is the objection. |
| [Appellant's Counsel]: | Judge, she is telling the jury and the Court that questioning by the Defense is going to victimize and re-victimize the complaining witness. |
| The Court: | Overruled. |
| [Dr. Donaruma]: | I think there's a legitimate concern that undergoing questioning that isn't trauma informed does cause the children to re-experience that trauma as somebody with another type of PTSD [post traumatic stress disorder] might re-experience their trauma in the form of flashbacks. It is a reasonable parallel, yes. |

Below are the portions of the State's closing argument that appellant complains of on appeal:[11]

---

[11] We have copied these complained-of arguments from appellant's brief.

56

• Nine percent of all sexual abuse is tried and convicted. Nine percent. Why? Because it's very hard. Because it's very hard. And we reach—we revictimize the victims in the jury, in the justice system, because the Defendant does have all these rights and they have to testify and we expect them to remember the details like an adult and that is not the way these cases work.

• It is very hard for children to testify because you saw what they looked like. They do get revictimized through the justice system. I believe they have all the rights in the world. They get those rights, but that comes at great costs and that's why nine percent of sexual abuse is convicted.

• Continuous [sexual abuse of a young child] has come about in the last two decades. I think it was shortly after 2010, I believe, is when it came into existence, okay? So it's a newer charge that the experts and the Legislature, after reviewing the expert and statistical information on sexual abuse of children and the difficulty in these cases, came up with this charge, okay?

• And because of the inability and the difficulty, especially in young children, but in any child and even in adults, because of the trauma associated with that, they changed the law to where the State is not required to prove a specific date, at all, okay?

• And because of the difficulty in these cases and because of all the delayed outcries, it has now no statute of limitations, okay?

• Nobody called me and said, I don't want to go forward. I don't force them if they don't want to go forward. If they would have said, nah, nah, it's not true, let's just forget about it. No, they didn't, okay?

• They do need to go to counseling. I agree. I've already had that discussion with Mom, but even if you go to counseling it's not enough to take it away.

• But I have never been prouder of representing and fighting for a family like I am of this one. The grandmother, as crazy as she is, she is a resident okay? She is here legally. Her daughter is a first generation American. Her husband is a resident, applying for his citizenship through his wife, okay? These people came here. They could be—that let mother live off the system. No. They are supporting her no matter how mad she was, okay? They have built a business from nothing, okay, and not—have built a huge business that provides trained workers for Bay and some of the biggest corporations in South Texas, okay? These are good people. And her heart, [Mother's] heart, maybe she doesn't know everything, okay, but she comes from a background in Mexico. They don't believe in counseling, okay? That's pretty typical in my culture and I've been here for seven generations, okay? But these—they don't believe in counseling. They believe you just go, go, go. Work hard, go, go, go, the good ones. There are some that just come and live

off the system. They are not those people, okay? They work hard and she has not allowed her heart to become black and hate her mother and hate her brother. You saw her. She is my hero.

- Some people, most people, never tell. You have no idea how few percentage people come forward [sic].

## B. Applicable Law and Analysis

Proper jury argument falls within four general categories: (1) summation of the evidence, (2) reasonable deduction from the evidence, (3) answer to argument of opposing counsel, and (4) plea for law enforcement. *Gallo v. State*, 239 S.W.3d 757, 767 (Tex. Crim. App. 2006). Error relating to improper jury argument is considered a forfeitable right under the *Marin* framework. *See Hernandez v. State*, 538 S.W.3d 619, 622–23 (Tex. Crim. App. 2018); *see also Ramirez v. State*, No. 13-20-00186-CR, 2022 WL 480245, at *1–2 (Tex. App.—Corpus Christi–Edinburg Feb. 17, 2022, no pet.) (mem. op., not designated for publication); Tex. R. App. P. 33.1. Therefore, an objection to improper jury argument must be preserved for appeal. *See Hernandez*, 538 S.W.3d at 622.

Appellant's objection to the testimony elicited from Dr. Donaruma does not comport with his complaints on appeal, as he failed to articulate the "right" being violated at that time let alone that it was his right to trial or confrontation under the United States Constitution as he now contends. *See Lucio v. State*, 351 S.W.3d 878, 900–02 (Tex. Crim. App. 2011) (holding that error was not preserved because the point of error asserted on appeal did not comport with the objection raised at trial); *Terrell v. State*, 311 S.W.3d 561, 563–64 (Tex. App.—Waco 2009, pet. ref'd) (concluding that appellant failed to preserve his appellant complaint where he argued before the trial court that the Texas Constitution was violated but he did not argue that Texas Constitution provides greater protection than

58

the federal due process clause as done on appeal); *see also* TEX. R. APP. P. 33.1(a)(1)(A) (noting that the complaint to the trial court must state "the grounds for the ruling that the complaining party sought from the trial court with sufficient specificity to make the trial court aware of the complaint"). Nor did he articulate any legal basis for his objection. *See* TEX. R. APP. P. 33.1. Appellant has failed to preserve any issue regarding Donaruma's testimony.

Additionally, because appellant failed to object to the State's alleged improper jury arguments, he has forfeited his right to complain of that on appeal as well, notwithstanding his "fundamental error" argument. *See Hernandez*, 538 S.W.3d at 622; *see also Castro v. State*, No. 01-24-00138-CR, 2026 WL 545759, at *11 (Tex. App.—Houston [1st Dist.] Feb. 27, 2026, no pet.) (mem. op., not designated for publication) ("Further, to the extent that appellant argues that he did not need to object to the State's purportedly improper statements during its closing jury argument because they amounted to fundamental error, we note that the Texas Court of Criminal Appeals has rejected that argument."). We overrule his final issue.

## VI. CONCLUSION

We affirm the trial court's judgment.

JENNY CRON
Justice

Do not publish.
TEX. R. APP. P. 47.2(b).

Delivered and filed on the
31st day of March, 2026.

59